[Civ. No. 1898.    Third Appellate District.—November 15, 1918.]

ROSE KREITZER, as Administratrix, etc., Respondent, v.
SOUTHERN PACIFIC COMPANY (a Corporation),
Appellant.

NEGLIGENCE — ACTION FOR DAMAGES FOR DEATH — RAILWAY BRIDGE
WATCHMAN—SAFE PLACE TO WORK—PRESUMPTION FROM POSITION
IN WHICH BODY FOUND.—In an action against a railway company
for damages for the death of a bridge watchman, alleged to be due
to the negligent failure of the company to provide a safe place of
refuge from passing trains, it could not be assumed from the fact
that the body of the deceased was found near a barrel on a plat-
form attached to the bridge and constructed to hold water barrels
and render them accessible in case of fire, that the deceased, while
seated near one of such barrels, fell asleep and allowed his head to
fall forward and come in contact with a passing engine or car, since
such assumption involved a violation of duty, which cannot be pre-
sumed, and also was in conflict with the presumption under sub-
division 4 of section 1963 of the Civil Code that "a person takes
ordinary care of his own concerns."

ID.—CONTRIBUTORY NEGLIGENCE — QUESTIONS FOR JURY.—Whether the
defendant was negligent in failing to provide a safe place for de-
cedent to work, or whether decedent was grossly negligent in fail-
ing to select a safe place designed for safety, or whether when
placing himself in the position stated he failed to take ordinary
precautions to protect himself, were questions which could not be
taken from the jury and decided by the court.

ID.—ASSUMPTION OF RISK—EVIDENCE—BURDEN OF PROOF.—The burden
of establishing the defense of assumption of risk is on the defendant.

ID.—PROXIMATE CAUSE OF DEATH—SUFFICIENCY OF EVIDENCE.—In this
case the evidence is examined and held sufficient to justify the sub-
mission to the jury of the question whether the alleged negligence
of the defendant was the proximate cause of the death of the de-
cedent.

ID.—DAMAGES NOT EXCESSIVE.—Where the decedent was earning wages
of seventy-five dollars a month and had a life expectancy of seven-
teen and four-tenths years, a verdict for seven thousand five hun-
dred dollars apportioned between his widow and children was not
excessive.

APPEAL from a judgment of the Superior Court of Stanislaus County, and from an order denying a new trial. W. H. Langdon, Judge.

The facts are stated in the opinion of the court.

F. H. Gould, W. C. Fitch, E. H. Zion, and Arthur L. Levinsky, for Appellant.

Griffin, Carlson & Boone, for Respondent.

CHIPMAN, P. J.—Plaintiff's decedent was employed by the defendant, on or about January 5, 1916, as night watchman to guard or watch the bridge or trestle belonging to defendant, crossing the Tuolumne River, at a point about one mile south of the station at the city of Modesto. He had discharged his duties as watchman for four or five days when, as is alleged in the first amended complaint, on January 11, 1916, between the hours of 6 P. M. and 12 o'clock midnight of said day, and while in the performance of his duties as such night watchman of said railroad bridge, he "was struck upon the head and body by one of the cars of a freight train which was crossing said railroad bridge" while traveling in a southerly direction, and was killed; that said railroad bridge "was and now is unsafe for any person to walk upon or travel over, due to the negligence of said defendant," because of the manner in which it is constructed, describing it; that there was and is no place on said bridge where deceased "could stand and remain at the same time that a train was crossing said bridge"; that the only places "in the nature of safety stations" were certain platforms about twenty-five yards apart "upon which a person could step from said bridge proper"; that barrels filled with water were placed on these platforms and "occupied most of the room or space upon each of said platforms"; that the spaces between said barrels and trains or cars passing over said bridge "were of such a narrow width that it was impossible for the said deceased at the time he was so struck by said car of said freight train, or at any other time, to remain on said platform while a train was passing"; that deceased was killed by said freight train while on the second one of said platforms

from the northern end of said bridge; that deceased had no notice or warning of the said approaching extra freight train; that at the time deceased was killed the defendant was engaged in interstate commerce and deceased was employed in such commerce and claims the benefit of the act of Congress approved April 22, 1908, and acts amendatory thereof, relating to the liability of common carriers; that in the course of his duties it became necessary, and he was so instructed by defendant, to go upon said bridge and to walk upon the top of said bridge for its entire length.

The answer is a specific denial of the averments of the complaint and alleges that the death of deceased "was caused solely by and through a risk assumed by him in the course of his employment," and, furthermore, that his death "was caused by his own carelessness and negligence in failing to observe the approach of defendant's train while said train was upon the bridge referred to in plaintiff's complaint herein."

The cause was tried by the court with a jury and a verdict was awarded as follows: For the plaintiff in the sum of seven thousand five hundred dollars, apportioned as follows: To the widow, age fifty-two years, $3,750; to the child, Helen, age sixteen years, $227.30; to the child Mary, age fourteen years, $454.50; to the child, Clara, age seven years, $1,250.50, and to the child, William, age five years, $1,818.20. Judgment was accordingly entered. Defendant appeals from the judgment and from the order denying its motion for a new trial.

Witness Coburn held the position of track foreman on construction work for defendant and was foreman on the section including Modesto and the bridge or trestle where the accident occurred. He testified: "At the time that I arranged with decedent to go to work for the railroad company I went over to his house, I think, to see him. I told him I wanted to hire a man to protect the bridge, and I wanted to put a watchman on there at night; that we had found dynamite underneath it, and that I wanted to put a white man there that I could depend upon. I told him the wages would be two dollars a night, and that he would have to work from six to six. I told him to use no arms,—in case he met with some accident down there not to use any arms. He said, 'All right, I will do it.' I never saw him down there at work."

No other or further instructions were given deceased. He had worked for other railroad companies and had previously worked for defendant company on that section, "doing ordinary track repairing, putting in new switches and changing rails and one thing and another like that and changing ties." He had been employed by defendant on that section for several months, in 1915, and in the course of his employment crossed this bridge two or three times a week on a handcar. He was an active man, quick in his movements, in good health, and possessing all his faculties. He was about five feet four and one-half inches in height and weighed about 140 pounds. He went to his work on the night of January 11, 1916, as usual, and appellant claims he was last seen alive about 7 o'clock. Witness Dodd, watchman on the county bridge which crosses the Tuolumne River about sixty feet from the railroad bridge, testified that from his house he had a clear view of the railroad bridge. He testified: "I remember an occasion when someone purported to have found dynamite underneath the railroad bridge. After that, there was a night watchman there. I saw him upon the bridge in the night. I remember the occasion when the body of Mr. Kreitzer was found. I went out to see the body on the bridge, and helped get the body out. The night before that, I saw a person with a lantern upon the bridge between 8 and 9 o'clock. My usual hour of retiring is from half-past 8 to 9 o'clock, sometimes a little bit after, owing to what I have got to do. Just before I retired, I came out and looked around and went back to bed. I saw a man upon the railroad bridge with a lantern. This was the night before I saw the body. I saw the man with the lantern just before I got ready to go to bed. The man with the lantern was about two hundred feet from me, going south." It appeared that the trains passing through Modesto, southbound, were passenger train 50, which arrived at 8:37 P. M. and departed at 8:41 P. M.; the next was the second section of No. 50, which arrived at 8:47 and departed at 8:49 P. M. The next train southbound which passed the station was an extra engine, 2435, without stopping, at 9:03 P. M. The trains passing south after midnight were one arriving at 3:30 and departing at 3:50; the next was an extra, 1656, going south, which arrived at 5:30 and departed at 5:50; the next was an extra, 1801,

going south, arrived 6:30 and departed at 7:40. It was testified that it was not unusual that extra trains passed in the night, "it is an every-day occurrence."

Witness Wood, coroner and public administrator for Stanislaus County, arrived at the scene of the accident between 7 and 8 o'clock the morning "following the death of deceased. He testified: "I saw Mr. Kreitzer's body on the railroad bridge, at the end toward Modesto, on the left-hand side or east side of the bridge, the up-river side. The body was between the end of the timber and a water barrel. It was between two hundred and three hundred feet from the west (north) end of the bridge, and wedged in between the end of the timbers that projected out under the track and the water barrel that was resting on the extreme end of the timber, wedged in between the end of this timber and the water barrel. It was sitting in a crouched position, his feet drawn up under him and his head was leaning to the—toward the south, toward the river; that is toward the south. I took the body out and took it to my place of business. I found marks or bruises on the right-hand side of the head. The bruises were near the front, but on the right-hand side. There were no other marks upon the body. There was nothing on his person except a pipe and something of those things. On the ground underneath there was a great deal of blood, also a lantern and his hat. These were lying directly under him, on the ground below. A lunch-pail was found. The lunch was not eaten. I think Mr. Davis, the sheriff, found it. His back was up against the barrel, his head turned toward the south. He was hit upon the right-hand side of the head. The distance between the barrel and the end of the timbers that were against his breast was about sixteen or seventeen inches. The tie was against his breast and the barrel against his back. He was touching both barrel and tie, so close that we had to shove the barrel off in order to remove his body from between the tie and the barrel. The barrel was not attached to the timber. It was full of water, and with some effort we succeeded in shoving it off on to the ground. . . . His face was facing the railroad ties and the rails. When I took the body out, he was dressed heavy. It was cold as the present weather, except it was foggy weather. He had on winter

underwear, ordinary shirt and coat and heavy storm coat and vest.''

*Fig. 1.*

Witness Davis, sheriff of the county, helped to remove the body. He testified that the body was about 250 or three hundred feet from the Modesto end of the bridge. ''His head was leading to the south, and his face toward the railroad track; his back was wedged in between the barrel and the timbers, in a squatting position. We had considerable trouble getting him out.''

The bridge structure consists of a steel bridge proper crossing the Tuolumne River for about 150 feet at the south end and a trestle thence northerly for about a quarter of a mile, the roadbed being about twenty-eight feet above the river bottom land. The structure is graphically shown by a sketch attached to appellant's brief, which appears to illustrate correctly the situation at the location of the accident and the general construction of the trestle. Figure 1 is a cross-section of the trestle at the cap where deceased met his death, showing the barrel, ''a''; the end of the cap without any barrel, ''b''; the location of the lowest step of a locomotive with relation to the bridge ties, ''c.'' The plan of construction is given by witness Coburn, foreman of defendant's construction work: ''First, piles were driven four in number in each set. The sets were fifteen feet apart center to center. Each set was driven in crosswise of the track. Across the

top of each set of piles was placed a timber twelve inches by fourteen inches in diameter and twelve feet in length. On top of this cap were placed six stringers, three under each rail. These stringers are eight inches in thickness, sixteen and one-half inches vertical, and are about thirty feet in length and run parallel with the track. The distance from the outer end of the cap to the outer side of the outer stringer is two feet and two inches on each end. On top of these stringers are placed ties eight inches horizontal by six inches vertical, and nine feet in length, and placed four inches apart. On top of these ties are placed the steel rails, which are four feet eight and one-half inches apart and midway between the rail and the outer end of the tie is the guard-rail, a small timber eight inches horizontal by five inches vertical, running parallel to the rail and mortised into the tie about one inch. Upon the end of every tenth cap, on each side of the trestle, is a small platform and on this platform is placed a barrel filled with water for use in case of fire. Between the barrel and the end of the ties is a space of sixteen or seventeen inches. The platform upon which the barrel is placed is just large enough to set the barrel on. About 150 feet of the extreme southern end, where the bridge crossed the river, was made of steel and had no barrels.''

The evidence was that the construction of this trestle was in accordance with the plans prevailing throughout the Southern Pacific system. The contention of plaintiff is that the defendant was negligent in failing to provide a safe place for the decedent to take refuge from passing trains. In other respects we do not understand that there is objection urged to the general construction of the bridge. So far as the public is concerned, there was no obligation upon the railroad company to provide safety stations. There was, however, a duty to make such provision for its employees, and its contention is that the ends of these caps, occurring on both sides of the track every fifteen feet, furnished such places of safety. Witness Burgess, supervisor of bridges and buildings for the defendant corporation, testified: ''I am familiar with the methods employed by railroad men in getting out of the way on bridges of this kind when trains are passing. They simply get down on the cap and sit there until the train passes, steadying themselves with a hand on the guard tim-

bers at the end of the tie.   That position involves no danger
for a railroad man or for any man of ordinary activity with
his faculties.   A man can remove himself from the surface
of the bridge, such as this, and seat himself on the tie as I
have suggested in not over ten seconds, I should judge.   I
have done this, and that is the way that I in my practice as
a railroad man adopt of removing myself from the platform
of a bridge to a place of safety when trains are passing, and
that is the ordinary way that railroad men in this section of
the Southern Pacific take care of themselves when trains
are passing on long bridges of this character.   The ties are
four inches apart, and the top of the tie is eight inches.
There is no difficulty in walking at an ordinary rate of speed
over these ties.   The practice of placing a barrel upon a cap
is for fire protection.   I never observed any man under my su-
pervision while working on these bridges attempt to take refuge
when a passing train came along on a platform on which the
barrel is situated.   I never attempted it.''   He testified that
the distance from the end of the tie to the end of the cap is
a foot and a half.   ''I would not want to stand there, to stand
up.   I would not call that a safety station in that position;
not standing up.''   The distance from the top of the cap to
the steps of a locomotive (see figure 1) is four feet, showing
that in a sitting position a man would be safe.   The witness,
Coburn, testified: ''Whenever the train comes along, these
caps are located about fifteen feet apart and we would scatter
out and get on top of the caps that would be underneath
the track like, sat on there while the train was passing over.
I never had but one man that could not get down on the caps.
No one ever made any objection to the method of getting
down. . . . That method of escaping from passing trains has
been in use ever since my knowledge, that is, for thirty years,
and all that time it has been a safe method for escaping
trains.''   He was asked whether the railroad men took refuge
at any time between the barrels on the caps and answered:
''No, sir.   Neither myself nor the other men employed in
fixing the track would go for safety upon these places where
the barrels were when the trains were passing.   There is
some room there, but you take chances in getting there.   The
space was too narrow.   I know, however, that a man the
size of the decedent could, if he had sat upon the cap where the
barrel sat, with his legs hanging down, escape any possible

injury from the car if he had kept his head in the proper place. I say that because when he gets down on the cap, he is below the top of the rail if he stoops his head down a little bit." Speaking of this as a place of safety, he testified: "A man could get in between on the station where the barrels were, and if he got down, he would be perfectly safe if a train went over. He would have to be a small man, understand; I don't mean a great big man. I mean a small one, and get his head down in order to get in the clear. I wouldn't like to get in there unless I had my head down." As before shown, the decedent was a small man. Witness Burgess, on cross-examination, testified that since the accident they had raised the platform even with the ties and extended it so that the barrels are now three feet from the end of the ties. They were formerly eleven inches from the end of the ties. He testified: "The purpose for which they were put in was to make a place for the water barrel more accessible in the case of fire. That is the reason they were built; not for safety stations." Witness Coburn testified: "The barrels are about thirty-eight inches in height and are located on alternate sides of the track, first on the right side and then on the left side, and are about seventy-five feet apart."

Witness Foulks, telegraph operator of defendant company, testified: "There is a set of block signals at the curve leading to the bridge east of Modesto a short distance that should be in plain sight of the bridge. During the night there is a light; when it is safe, it is a green light and the arm extends downward in a slanting position, that is, when there is no train in the block coming from the west. When the train enters the block coming from the west, the signal-arm goes up, becomes horizontal, and the green light disappears and a red light is shown. . . . The train would ordinarily whistle five different times passing through this town from the west before it reaches the bridge. No whistle is given for the bridge." It was testified that there is a whistling post a quarter of a mile from the bridge. Witness Coburn testified that when engines are coming from the north whistles can be heard upon the bridge when they are in the block and the ringing of bells can be heard as they pass through the town. "The headlight of an engine approaching can be seen from the northern end of the bridge for about a half a mile, very near a half a mile." The testimony of the engineer and fire-

man of engine No. 2435, that passed Modesto at 9:03 P. M., was that it was on a trial trip and traveling as an extra without cars other than the tender; that they were on the lookout in passing through Modesto and crossing the bridge; that the engine bell was ringing as they crossed the bridge; that they saw no man on the bridge and were quite sure if they had struck deceased they would have seen it.

Witness Osborne, car foreman of defendant company, testified, as did witness Coburn, to the effect that the end of the cap was a safe place of refuge during the passing of trains and that he could not see "that there would be any difference getting down in the night time than it would in the day time, if he had a lantern." He testified that it would not be as easy for a person to get down on the cap the first time in the night as it would be in the daytime. The record states: "Here a model of a portion of the bridge is offered in evidence, consisting of a cap, the stringer nearest to the cap in position, several ties placed on the stringer and the guard-rail. The jury inspected the same, went upon the top, experimented in getting down from the top of the ties and guard-rail on to the cap. The witness illustrated how he could sit upon the ends of the ties, place his feet upon the cap, and then go down upon the cap upon one knee and one foot." It was stipulated that if the engineers and firemen of the trains passing over the bridge between 6 P. M. and midnight of January 11, 1916, were present, they would testify that they crossed the bridge in the usual manner, giving the customary signals by bells and whistles; that the trains were not operated at over ten miles an hour and had powerful electric headlights by which objects within 250 feet were plainly visible; that they kept careful watch and saw no man on the bridge and no light at or near any barrel and "that neither his engine nor his cars struck or killed the deceased."

We have at considerable length endeavored to state the evidence and to show the conditions existing at the time of the accident. Defendant advances the following contentions:

"First: That defendant was not negligent in failing to provide a safe place for the decedent to perform his work.

"Second: That the sole cause of the injury to the decedent, if it was caused by a passing train, was the gross negligence of decedent in failing to select places on the bridge which were designed for and were perfectly safe, and also because

he did not, when placing himself in position selected, take ordinary precaution to protect himself, in which event he would have been safe.

"Third: The danger attendant upon decedent's manner in performing his work was open, obvious and plainly apparent. He made no objections thereto and continued in the performance of his work after having had full opportunity to observe and appreciate the surrounding conditions. He therefore assumed the risk attendant upon the performance of the work which he undertook.

"Fourth: Even assuming that defendant was negligent in failing to provide a safe place to work there is no evidence which discloses that such failure was the approximate cause or had anything to do with the death of decedent.

"Fifth: The damages awarded were excessive."

Deceased had never before done any work for defendant at night and this was his first service as watchman. So far as appears, his knowledge of the construction of this bridge and trestle was such only as he may have acquired in riding over it on a handcar to and from his work elsewhere two or three times a week for some months. It is not shown nor is it claimed by defendant that he knew anything about the provisions made for men working on the bridge to avoid passing trains except such knowledge as he had acquired in the two or three nights he had served as watchman before he was killed. What course he pursued during these nights, if he happened to be on the bridge when a train passed, we do not know. He may have been at one end of the bridge when the two regular trains passed not long before the extra engine 2435 came along. It is reasonably clear that he met his death by being struck by some part of an engine or car while endeavoring to protect himself by taking refuge on the platform where a barrel stood on the east side of the trestle, two or three hundred feet from the north end. The position of the wound caused by the blow which crushed his skull and the position of the body left little doubt of the cause of his death. There were no trains before midnight except the two regulars a few minutes before 9 P. M. and the extra engine 2435 a few minutes after 9 o'clock. The next trains going south were after 3:30 A. M. His lunch was not eaten, which would indicate that the accident occurred before midnight, for it is reasonable to assume that he would have eaten it before

3:30 A. M.   The testimony of the county bridge watchman justifies the inference that he saw the deceased about the time engine 2435 passed through Modesto and not far from where he was killed.   If he had been standing on the platform when the blow struck him it would almost certainly have knocked him off and he would have been found on the ground below. Dr. Hennemuth, who made the autopsy, testified: "I found the right frontal bone and the right temporal bone of the skull caved in and a fracture extending down through the base through the petrous portion of the temporal bone.   I think there were two cuts on the head, that is, the scalp was cut or ripped open.   There were no bruises on any other portion of the body that I remember at the present time."   If he had been standing the blow would have struck him on his side below the shoulder.   Sitting or crouching, as the body was found, the step of locomotive 2435 (figure 1) could have struck his head.   Doubtless the blow, and the involuntary movements of the body as a result of the blow, would cause it to take the cramped position in which it was found.   There were no trains after this locomotive passed until 3:30 A. M. and it is suggested by appellant that after the engine had passed there were no trains due on regular time for several hours and deceased may have seated himself by this barrel and fallen asleep and allowed his head to drop forward, and thus come in contact with some part of an engine or car.   But this assumption cannot be indulged, for it involves a violation of duty which cannot be presumed.   Besides, there is a presumption "that a person takes ordinary care of his own concerns."   (Code Civ. Proc., sec. 1963, subd. 4; *Crabbe v. Mammoth Channel G. M. Co.*, 168 Cal. 501, 506, [143 Pac. 714].)   It is conceded that the floor of the bridge is a place of danger when trains are passing over it, and that the only place of escape is either on the end of the caps or at the platforms where barrels are situated.   The evidence was that it is the custom of men working on the floor of the bridge in the daytime to take refuge on the caps when trains are passing.   No such custom is shown as to night-time, for repair work is not then done.   Witness Coburn, who testified to this custom, stated that he had one man on a crew who could not get down on a cap.   Standing on the cap was considered unsafe.   While the evidence was that the platforms built for barrels may not have been built with special reference to fur-

nishing a means of escape from passing trains, they had that appearance and could be so used, and to one going on the bridge as watchman, not familiar with the means of escape from passing trains and not knowing the exact space between the barrel and the projecting steps or parts of cars, would naturally, we think, in the night-time, resort to one of these platforms rather than to one of the caps of whose relation to the engine or cars he had no more knowledge and which are not so readily accessible.

Deceased was told to watch the bridge, but was not instructed how to do it. It is claimed that he could have performed his duty by walking on the county bridge, which is parallel to the company's bridge and sixty or one hundred feet distant from it; or he could have walked underneath the bridge, thus avoiding any danger from passing trains. It seems to us that when told to watch the bridge deceased would naturally assume that he was to patrol it, and to do this efficiently he must go upon it. If, as is claimed, ample provision was made to escape passing trains, it was not a place of danger. If there was danger from lack of such provision or from provision likely not to be comprehended by deceased, he should have been warned of the danger and instructed how to avoid it. The suggestion that he should not have gone on to the floor of the bridge implies danger and lack of provision to escape it. Appellant cannot consistently urge that deceased ought not to have gone over the bridge and at the same time urge that it was entirely safe, for, if the bridge was a safe place, there is no reason why the deceased should have avoided going on to it in the discharge of his duty.

It is not to be overlooked that after this accident the defendant raised the platforms for the barrels even with the ties and extended them so that the space between the barrels and the ends of the ties is three feet, whereas formerly this space was but eighteen inches. The present platforms are quickly accessible and afford a perfectly safe place of refuge. The change may not establish the fact that the former platforms were unsafe, but it shows very clearly that at small cost a safe place has been provided, and might have been provided, before the accident occurred and would have avoided it. It is also to be considered that a working model of a section of the bridge was introduced, and the jurymen were allowed to

make an experiment of getting down to the caps from the ties, and the operation as railroad men used the caps for that purpose was illustrated by a witness.

Whether or not defendant was negligent in failing to provide a safe place for the decedent to work; whether decedent was guilty of gross negligence in failing to select a place which was designed for safety and was safe; whether, when placing himself in the position selected, he failed to take ordinary precautions to protect himself, were questions which, under the evidence, could not be taken from the jury and decided by the court as matter of law, but were proper questions for the jury. In *Herbert* v. *Southern Pacific Co.*, 121 Cal. 227, 229, [53 Pac. 651], the court said: "The rule is, that negligence is a question of fact for the jury, even when there is no conflict in the evidence, if different conclusions upon the subject can be rationally drawn from the evidence." (Citing cases.)

Appellant contends that deceased assumed the risk attendant upon the performance of the work which he undertook, for the reason that his manner in performing the work "was open, obvious, and plainly apparent"; that "he made no objections thereto and continued in the performance of his work after having had full opportunity to observe and appreciate the surrounding conditions."

The burden of establishing the defense of assumption of risk is upon the defendant. (*Kanawha & Michigan Ry. Co.* v. *Kerse*, 239 U. S. 576, [60 L. Ed. 448, 36 Sup. Ct. Rep. 174].) "The question of assumption of risk is quite apart from that of contributory negligence. The servant has the right to assume that the master has used due diligence to provide suitable appliances in the operation of his business, and he does not assume the risk of the employer's negligence in performing such duties. . . . This rule is subject to the exception that where a defect is known to the employee, or is so patent as to be readily observed by him, he cannot continue to use the defective apparatus in the face of knowledge and without objection, without assuming the hazard incident to such a situation." (*Choctaw, O. & G. R. Co.* v. *McDade*, 191 U. S. 64, 67, [48 L. Ed. 96, 24 Sup. Ct. Rep. 24].) Appellant relies upon the exception to the rule. The evidence does not compel the inference that deceased had knowledge of the danger attending resort to the platform as a place of safety

where he was killed, or that the risk was so patent as to be readily observed by him. On the contrary, defendant's witnesses testified that if he was sitting down, as in fact he was when found, and had "kept his head down a little," there would have been no danger. There was no evidence that he knew there was not sufficient space between the barrel and the steps of a passing locomotive or parts of the cars, to make the place one of safety. He may not have had occasion to use a platform when trains were passing on any previous night; or he may have used it and not been hit. He cannot be presumed to have known the exact limit of safety in occupying a platform; knowledge of the exact width of the engines or cars or the distance they extended beyond the rails cannot be imputed to him. He resorted to what the jury believed he had a right to assume was a place of refuge. The presumption is that he took a position on the platform that offered security from injury.

In *Crabbe* v. *Mammoth Channel G. M. Co., supra,* at page 506, of 168 Cal. [143 Pac. 716], the court said: "Where death is occasioned under circumstances such as this, without eyewitnesses, the law comes to the aid of the plaintiff who is pressing a suit for damages for the death, and that law is found in the presumption of the Code of Civil Procedure—namely, that a person takes ordinary care of his own concerns. (Citing cases.) This is a controvertible presumption, it is true, but until controverted it is evidence in accordance with which the jury is bound to decide." (See *Boyle* v. *Coast Imp. Co.,* 27 Cal. App. 714, 722, 723, [151 Pac. 25].) In the case of *Texas & Pacific Ry. Co.* v. *Swearingen,* 196 U. S. 51, [49 L. Ed. 382, 25 Sup. Ct. Rep. 164], track No. 1 ran over a scale in the yard at El Paso. Two feet beyond the scale-box was track No. 2, parallel with No. 1, and beyond this two other tracks, Nos. 3 and 4. The space between a ladder on the side of a freight-car when running on track 2 and the scale-box was shown to be nineteen and one-half inches. The scale was in plain view and plaintiff knew of its location, but did not know of its dangerous proximity to track 2. In considering the contention that plaintiff assumed the risk the court said: "The court of appeals was of opinion, and rightly, we think, that the dangerous contiguity of the scale-box to track No. 2, and the extra hazard to switchmen resulting therefrom, was not so open and obvious on other than a

close inspection, as to justify taking from the jury the determination of the question whether there had been an assumption of the risk. The plaintiff was entitled to assume that the defendant company had used due care to provide a reasonably safe place for the doing by him of the work for which he had been employed, and as the fact that the defendant company might not have' performed such duty in respect to the scale-box in question was not so patent as to be readily observable, the court could not declare, in view of the testimony of the plaintiff as to his actual want of knowledge of the danger, that he had assumed the hazard incident to the actual situation. (*Choctaw, O. & G. R. Co.* v. *McDade,* 191 U. S. 64, 68, [48 L. Ed. 96, 100, 24 Sup. Ct. Rep. 24].) ''

An objection was made to an instruction given by the trial court that plaintiff knew the location of the track scale-box and the track 2 on which he was riding in reference to the scale-box; that the location was open and obvious to plaintiff's view, and as an experienced brakeman he was charged with notice that riding on the cars as he did was dangerous, and that he assumed the risk and the court should have so charged the jury. In commenting upon this contention the supreme court said: ''This assignment but reiterates contentions made in connection with the assignment based on the alleged error in overruling the motion for judgment. As we have already decided that knowledge of the increased hazard resulting from the dangerous proximity of the scale-box to the north rail of track No. 2 could not be imputed to the plaintiff because he was aware of the existence and general location of the scale-box, it was for the jury to determine, from a consideration of all the facts and circumstances in evidence, whether plaintiff had actual knowledge of the danger.''

In the case of *Choctaw, O. & G. R. Co.* v. *McDade, supra,* the court said: ''Upon this question the true test is not in the exercise of care to discover danger, but rather the defect is known or plainly observable to the employee.''

As to appellant's fourth point, we think the evidence was sufficient to justify the submission of the question to the jury whether the alleged negligence of defendant was the proximate cause of decedent's death. We have stated very fully the facts and circumstances attending the death of decedent and need not repeat them. ''Doubtless,'' as was said in *Wabash Screen & Door Co.* v. *Black,* 126 Fed. 721, [61

C. C. A. 639], "a jury ought not to be permitted to speculate, in the sense of guess, between causes, when no reasonable explanation of the injury can be found in the testimony. But, in the absence of direct testimony, the simple suggestion of theories by the defense does not reduce the jury to mere speculation, and disqualify it from determining the cause of the injury complained of." We feel quite satisfied that there was sufficient evidence to warrant the submission of the question to the jury.

It is claimed that the verdict was excessive for the reason, as given in appellant's brief: "The uncontradicted testimony showed deceased received $75 per month. No allowance at all was made for any cost of living, clothing, or shelter of the deceased."

The life expectancy of deceased was 17.4 years. He had a probable earning capacity of nine hundred dollars per year for 17.4 years, or $15,336. The plaintiff was awarded seven thousand five hundred dollars, to be apportioned between herself and her minor children as above shown. We may assume that the jury took into account the items mentioned by appellant, since they reduced decedent's gross earning capacity nearly one-half.

The judgment and order are affirmed.

Hart, J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on January 13, 1919.

Sloss, J., Melvin, J., Lawlor, J., and Lennon, J., concurred.