[L. A. No. 15517. In Bank.—April 6, 1936.]

MYRON H. WELLS, as Trustee in Bankruptcy, etc., Respondent, v. ELWOOD LLOYD IV et al., Defendants; BANK OF AMERICA (a Corporation) et al., Appellants.

74

Freston & Files, Louis Ferrari and Edmund Nelson for Appellants.

Guy Richards Crump and A. I. McCormick for Respondent.

THE COURT.—After further consideration of this cause, we are satisfied with the disposition made by the District Court of Appeal, Second District, Division One, and we hereby adopt as our opinion the opinion of that court by Mr. Justice Shinn, sitting *pro tempore:*

"This is an action prosecuted by the trustee in bankruptcy of the estate of Bay Cities Guaranty Building-Loan Association, a corporation, bankrupt, to recover damages alleged to have been suffered by the bankrupt corporation by reason of alleged fraudulent acts of the defendants. The action was brought by the corporation before bankruptcy, the trustee, as such, being thereafter substituted as plaintiff. Upon the trial the action was dismissed as to all defendants except Merchants National Trust and Savings Bank of Los Angeles, herein referred to as the bank, and its successor, Bank of America.

"The case was tried before a jury which, under an instruction of the court so to do, rendered a verdict in plaintiff's favor. The question of the amount of plaintiff's damage was submitted to the jury and was fixed by the verdict at the sum of sixty thousand dollars.

"Appellants assign error in the giving of the first instruction, contending that no fraud was shown on the part of the bank and that in any event there were issues of fact other than the question of damages, which should have been submitted to the jury. In addition to a denial of the claims of appellants, respondent takes the position that trial of questions of fact by the jury, except as to the issues of damages, was waived. The alleged waiver is to be found, if at all, in an agreement of the parties that there were no questions of fact to be decided and that therefore the case should be withdrawn from the jury and decided by the court upon the questions of law presented. Whether there was such an agree-

ment must be determined from a consideration of the acts and statements of the parties at the time the evidence was closed. At that point defendant made a motion for nonsuit, specifying certain grounds therefor. This motion was denied. Defendant then moved the court that the jury be instructed to render a verdict for defendant, basing this motion upon the same grounds as the motion for nonsuit. This motion was denied. Instructions were presented to the court by each party, those of the defendant, at least, covering the entire case. The case was argued to the jury and, upon conclusion of the argument, the court instructed the jury to render a verdict in plaintiff's favor and to assess the damages according to the theory adopted by the court for the measurement thereof. The instruction for directed verdict was requested by plaintiff. Plaintiff now invokes the rule that mutual requests for an instructed verdict amount to a withdrawal of the case from the jury and a consent that the same may be decided by the court. This rule is one which has received general recognition in the greater number of state courts and in the federal courts. In numerous other jurisdictions the courts have declined to adopt it. The question has not been presented to an appellate court in California, at least no decision has been cited to us dealing with this question.

"The basis of the rule relied upon by respondent, which is sometimes referred to as the New York rule, is that mutual motions for an instructed verdict amount to a waiver of trial by jury. The foundation of the waiver rests in the tacit agreement that there are no questions of fact for the jury to determine. The waiver of jury trial is held to be the necessary result of such agreement. (*Beutell* v. *Magone,* 157 U. S. 154 [15 Sup. Ct. 566, 39 L. Ed. 654] ; see, also, 64 Cor. Jur. 434, and notes 18 A. L. R. 1433, and 69 A. L. R. 634.) The rule does not apply where either of the moving parties, after denial of the motions, requests that the case be submitted to the jury. (*Empire State Cattle Co.* v. *Atchison, T. & S. F. R. Co.,* 210 U. S. 1 [28 Sup. Ct. 607, 52 L. Ed. 931, 15 Ann. Cas. 70]. See note, 18 A. L. R., pp. 1446 and 1449.)

"In the states where the rule is not followed it is held that motions by each of the parties for a directed verdict do not, of themselves, establish consent that no questions of fact are involved, and therefore do not amount to a waiver of trial by jury. In these states it is held that a case may be withdrawn

from the jury but that something more than motions of each party for a directed verdict is required to show an agreement to a trial by the court, such as an express agreement that there is no dispute as to the facts or an express waiver of jury trial in connection with motions for an instructed verdict.

"Well-reasoned opinions are to be found supporting the general rule and also in opposition thereto. The question in each case is whether the record shows a sufficient waiver of jury trial. In this state there are several methods by which a jury may be waived. The only one which might apply here is the one found in subdivision 3, section 631, Code of Civil Procedure, which provides that the waiver may be made by oral consent in open court, entered in the minutes. We are of the opinion that the proceedings had, as set forth herein, do not show a waiver. The parties were not in agreement that the evidence was without conflict. Each was contending that all of the inferences of fact ran in his favor. According to the plaintiff, fraud on the part of the bank was proven and damage as the direct result thereof. According to the defendant no fraud was shown nor any damage resulting from the acts of the defendant bank. Where the opposing parties hold such contrary views as to what facts are proved directly, or by inference, it is difficult to understand how it can be said that the parties agree that the facts are undisputed and that questions of law only are involved. In some jurisdictions where the majority rule has been long established, motions by each party for a directed verdict are held to amount to a waiver of jury trial, even though the facts are in dispute. But we think there is no reason why the rule of implied waiver should ever be followed except where it clearly appears that the parties have agreed that the evidence upon all of the material issues is unconflicting. So much, at least, should be shown in this state, where the methods of waiver of jury trial are prescribed by statute, before it could properly be held that the parties have even substantially complied with the requirement that a jury may be waived by oral consent, expressed in open court and entered in the minutes. We therefore conclude that the case was not withdrawn from the jury. ■

An additional reason for so holding is the fact that the presentation of plaintiff's requested instruction for a directed verdict was not a motion for a directed verdict. (*Estate of Easton*, 118 Cal. App. 659 [5 Pac. (2d) 635]; *Estate of Cald-*

*well*, 216 Cal. 694 [16 Pac. (2d) 139].) ' While a party, in requesting an instruction for a directed verdict, asks that the case be taken from the jury we can accord to such request only a limited effect. We cannot say that the party has thereby waived the right to jury trial, and to preserve his right must at some future stage withdraw his request and ask for submission to the jury. It is not an uncommon practice for each party to submit an instruction for a directed verdict in his favor. Also under our practice a motion for a directed verdict is regarded as a demurrer to the evidence (*Hunt* v. *United Bank & Trust Co.*, 210 Cal. 108 [291 Pac. 184]), and it assumes no different character in a case where each party makes a motion. We hold that such motions alone do not waive submission of the case to the jury upon denial of the motions.

"Lloyd Building and Loan Association was organized as a guarantee capital association, and had issued, without consideration, one thousand shares of guarantee capital stock. The issued stock was held for the benefit of the association, which had no other assets of more than nominal value and had not received a permit from the building and loan commissioner to do business. In order to obtain a permit, without which it could not lawfully engage in business, it was necessary for the Lloyd Company to have at least one hundred thousand dollars in cash capital and at least ten thousand dollars for organization and operating expense. Under the rules and regulations of the commissioner, a guarantee capital building and loan association, to be qualified to do business, was required to have one hundred thousand dollars paid-in capital. An applicant for a permit was required to furnish a certificate from its bank showing it to have not less than the sum of one hundred thousand dollars on deposit to its credit. Lloyd Association obtained a permit in the following manner:

"Defendant Commagere, acting in concert with Lloyd Association, gave Merchants National Bank his thirty-day promissory note for one hundred and twenty thousand dollars, interest on which, for said period, was guaranteed by Alvin H. Frank and Company. The bank credited the account of Commagere with the amount of the note. Commagere purchased a cashier's check payable to himself for a like amount, and, with the cashier's check purchased, in the name of Lloyd Association, and the bank issued, its certificate of deposit for

one hundred and twenty thousand dollars, payable in thirty days. This certificate was endorsed and placed in an escrow with the escrow department of the bank, together with certificates for one thousand shares of the capital stock of Lloyd Association, being all of the outstanding stock. Nine hundred and ninety-five of the shares were in the name of Commagere, and one share in the name of each of five other persons. Escrow instructions were given the bank by Lloyd Association, which provided that the stock might be sold for one hundred and twenty thousand dollars within a thirty-day period; that if this money was provided from stock sales, certificates were to be issued to the purchasers, the money received therefrom was to be used to pay the Commagere note, and the certificate of deposit was to be delivered to Lloyd Association. If the full sum of one hundred and twenty thousand dollars should not be received from stock sales, such sums as had been paid in were to be returned to the persons furnishing the same, the stock was to be returned to Lloyd Association and the certificate of deposit was to be delivered to the note department of the bank for the purpose of paying the Commagere note.

"The note was given, the certificate issued and the escrow opened on October 23, 1928, and on the same day a vice-president of the bank wrote a letter to the building and loan commissioner, stating that the bank had on that day issued a certificate of deposit to Lloyd Association in the sum of one hundred and twenty thousand dollars. By the use of this letter Lloyd Association procured from the building and loan commissioner, on November 9, 1928, a permit under which it became authorized to engage in the building and loan business in Los Angeles.

"On October 22, 1928, defendant Commagere had arranged with a bond house, Alvin H. Frank and Company, to purchase, for cash, bonds owned by the company at their par value of one hundred twenty thousand dollars. Nothing was done toward completing this purchase nor was anything accomplished toward selling, for cash, the stock of Lloyd Association, as was contemplated when the escrow was opened.

"At about the time the permit was issued, Elwood Lloyd IV and Commagere contacted the officers of Bay Cities Building and Loan Association, a company engaged in the building and loan business in Santa Monica. The Bay Cities company

was desirous of acquiring a building and loan association doing business in Los Angeles, and entered into negotiations to acquire the Lloyd Association, under representations that the latter held a permit and had assets of the value of one hundred and twenty thousand dollars.

"Alvin H. Frank and Company agreed to accept certificates of one hundred and twenty thousand dollars par value of the Bay Cities company for the bonds Commagere had agreed to buy, and Bay Cities agreed to accept the bonds and the one thousand shares of the outstanding stock of Lloyd Association in exchange for its certificates. This exchange was completed through the same escrow in the bank. Bay Cities thereupon became the owner of the bonds and stock, and Alvin H. Frank and Company acquired the Bay Cities certificates, which it sold to its customers. The certificate of deposit was delivered to the note department of the bank, together with seven hundred dollars, as interest, and the note was canceled. Defendant Commagere received some four thousand four hundred dollars commission from Frank and Company. The bank received seven hundred dollars interest and the return of its certificate of deposit and one hundred dollars as an escrow fee. The bonds which Bay Cities acquired were found by the jury to be worth only sixty thousand dollars. The difference between that amount and the face value of the Bay Cities certificates, or sixty thousand dollars, was awarded plaintiff as damages.

"Plaintiff claims to have been defrauded, in that its principal object in making the deal being to acquire the Lloyd Association, so that it could engage in business in Los Angeles, it acquired only the stock of the Lloyd Association and a permit to do business procured from the building and loan commissioner, which was invalid because it had been obtained by fraud. Under the theory upon which the case was tried and submitted to the jury, plaintiff's damage must be regarded as the amount of the loss sustained in acquiring the bonds, which were actually worth sixty thousand dollars less than they were represented to have been worth. No other damage was claimed or proven.

"With reference to the claim of the bank that there was no evidence of any wrongdoing on its part, we will point out briefly sufficient reasons why we must hold otherwise. The statement in the letter of the bank to the building and

loan commissioner to the effect that a certificate of deposit had been issued in favor of the Lloyd Association was false. It was a positive assertion not warranted by the information of the vice-president who signed the letter. It was a suppression of material facts of which the author of the letter had knowledge. The certificate of deposit never left the custody of the bank but was at all times held as security for the Commagere note. Mr. Brown knew, when he wrote the letter, that the bank would never part with the possession of the certificate of deposit or any money thereon until funds were provided from some other source for the payment of the Commagere note. Therefore the statement that the certificate had been issued to the Lloyd Association was true only in a limited sense and not in the sense in which the statement would be understood, and was understood, by the building and loan commissioner. The representation regarding the certificate of deposit was made by the bank with the intention that it should be sent to the commissioner. Merchants National Bank, therefore, actively participated in the deceit practiced upon the building and loan commissioner as a result of which a permit was issued.

"But this fact, alone, is not necessarily sufficient to fix responsibility on the bank for what transpired later. Bay Cities made its purchase in the belief that Lloyd Association had a valid permit to do business, and would not otherwise have purchased. Its loss, however, was sustained because of its belief that the assets of Lloyd Association were worth more than was their actual value. The liability of the defendants can arise only out of fraudulent representation as to the value of Lloyd assets. It is necessary, therefore, to inquire into those representations and the question of responsibility. The question of conspiracy is presented at the outset.

"It is alleged in the amended complaint that all of the acts of the defendants, down to and including the exchange of properties, were committed under a general conspiracy and scheme of all of the defendants, except Bank of America, to cheat and defraud Bay Cities and others. It is also alleged that all of the same defendants falsely and fraudulently represented the assets of Lloyd Association to be worth one hundred and twenty thousand dollars, and that Bay Cities believed and relied upon all of the said acts and statements of the defendants and so doing, and relying especially upon the

false representations of the bank concerning the certificate of deposit, exchanged its certificates for the stock of the Lloyd Association, thus acquiring the bonds.

"Bay Cities was entitled to receive a valid permit and it received one that was invalid. It suffered detriment on this account. It sustained further damage, in the amount of sixty thousand dollars, in accepting the bonds at a valuation of one hundred and twenty thousand dollars, and this was the only damage for which a recovery was had.

"Appellants, in denying responsibility for the acts which caused the damage, rely upon a claimed distinction between those acts in which the bank participated and those acts and representations in which the bank had no part. No such distinction may be drawn if the proof shows a conspiracy under which the bank would be answerable for all of the acts and statements of its coconspirators. Respondent claims that the evidence conclusively proves the existence of such a conspiracy.

"Under the rule limiting the right of the court to direct a verdict, which applies on this appeal, we must disregard all conflicts in the evidence and accept as true the evidence which tends to show the defendant blameless, and must draw all inferences from the facts in evidence most strongly in favor of the defendant. (*Estate of Lances,* 215 Cal. 397 [14 Pac. (2d) 768].) We must determine whether it might reasonably be held that the exchange of properties with Bay Cities was accomplished independently of the plan in which the bank joined with Commagere and Lloyd Association. We are not here permitted to consider the weight of the evidence which would support such a finding, other than to decide whether it would have sufficient substance to support a reasonable conclusion that the end accomplished was not within the scope of what the bank had a purpose to do or assist in doing.

"As we have heretofore pointed out, the original plan of the promoters, Lloyd and Commagere, was to qualify the Lloyd Association, and, thereafter, to sell one thousand shares of the stock for cash; the exchange with Bay Cities was agreed upon later. The thing which was ultimately accomplished was not shown to have been within the contemplation of the parties in the beginning.

"It was not shown without contradiction that Brown knew that the letter he wrote to the building and loan commissioner was to be used to obtain a permit for the Lloyd Association or that he knew that such a letter was required before a permit would be issued, although, as we have stated, the statement was knowingly false. The bank had no part in the negotiations between Lloyd Association and Bay Cities. It did not know, until a day or two before the exchange of property was made, that Bay Cities was an intending purchaser. It acted only as escrow holder of Bay Cities certificates and the property that was exchanged therefor. It knew nothing of the representations made by Lloyd Association as to the value of the bonds, or of the investigation thereof made by Bay Cities, or the knowledge it acquired. The terms of the exchange it knew by reason of the escrow. The position of purchasers of stock, under the original plan, would have been very different from that of Bay Cities, after its purchase was concluded. While the bank may have entered into a conspiracy with Lloyd and Commagere at any time, its participation, even as escrow holder of Bay Cities certificates and the bonds, was without knowledge of the circumstances under which the exchange had been arranged. ■ It is to be conceded, that where a conspiracy exists, none of the conspirators are to be exonerated merely because the means employed to accomplish a common purpose were unknown or unanticipated in the beginning, or because they did not join in or know of the acts of their conconspirators, or because the object accomplished differs from the one originally contemplated. But we think the present case is one in which all of these facts must be given consideration in deciding whether the bank entered into any conspiracy and if it did, whether it had a common purpose with the others in the conspiracy to perpetrate the fraud with which it was charged and for which it was held liable by the judgment.

"The conspiracy that must be shown is a combination of two or more persons to accomplish by concerted action a criminal or unlawful purpose or a lawful purpose by criminal or unlawful means. (*Parkinson Co.* v. *Building Trades Council,* 154 Cal. 581 [98 Pac. 1027, 16 Ann. Cas. 1165, 21 L. R. A. (N. S.) 550].)

"It is of the essence of a conspiracy that the parties should have a common purpose or design. ▋ Whether the defendants conspired together for any purpose, and if so, what that purpose was, were questions of fact. And if a conspiracy should be found to exist between the bank and some of the other defendants, it is a question of fact whether the object accomplished, namely, the acquisition of the Bay Cities certificate for the consideration paid, was within the common purpose of the guilty defendants. When we take into consideration the extent of the bank's interest in the transactions, its limited participation in and knowledge of entire scheme of the other defendants and of the methods employed to put them into effect, we cannot say that the evidence establishes, to the exclusion of every other reasonable conclusion, that the bank conspired to perpetrate the fraud on Bay Cities, which was ultimately accomplished. That question, we think, should have been submitted to the jury.

▋ "Assuming, therefore, that the bank is not responsible, as a matter of law, for the active representations made by the other defendants as to the value of the bonds, the next question is whether the acts in which the bank did participate, were necessarily the proximate cause of the loss sustained. Under the court's instruction this issue was tried and determined by the jury upon the theory that the damage represented by the disparity in the value of the bonds resulted proximately from the acts of the defendants in qualifying the Lloyd Association to do business, which was done for the purpose of enabling the association to sell its stock. This view of the case, we think, was erroneous.

"Under section 3333, Civil Code, the measure of damages for the breach of an obligation not arising from contract is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not. The code declares the general law on the subject, stated in 17 Corpus Juris, 728, as follows: 'It may be stated as a broad general rule that a wrongdoer is liable to the person injured in compensatory damages for all the natural and direct or proximate consequences of his wrongful act or omission.'

"Proximate cause is defined in 22 Ruling Case Law, 110, as follows: 'The proximate cause of an injury is that cause

which, in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred. . . . It is the efficient cause.' These definitions have oftentimes been approved by our courts.

"The negotiations with the Bay Cities Association commenced shortly before November 9th. It was represented to the Bay Cities Association by the Lloyd Association that the latter held a valid permit and had assets of the value of one hundred and twenty thousand dollars. The Bay Cities Association was furnished with a list of the bonds belonging to Alvin H. Frank and Company, which Commagere had agreed to buy and it was willing to take over the Lloyd Association if the bonds were worth par. Bay Cities made some inquiry as to the value of the bonds. Mr. Rishell, president of the company, and one or two others of its directors were appointed by the board to investigate the value of the bonds. Mr. Rishell inquired of Alvin H. Frank and Company, by whom he was told that the bonds were quoted at par, but that Alvin H. Frank and Company would not guarantee to sell them at par. On November 26 he went to San Francisco, where he interviewed the building and loan commissioner, confirmed the fact that Lloyd's held a permit and learned that the commissioner was not interested in the value of the bonds so long as they were a legal investment for the funds of a building and loan association. While in San Francisco he interviewed a banker and obtained some information concerning some of the bonds. On the morning he left Los Angeles for San Francisco he delivered the Bay Cities certificates to Mr. Stintin, vice-president of Bay Cities, to be placed in escrow. Stintin took the certificates to the bank where he entered into an escrow agreement to exchange them for the stock and bonds. This escrow was closed the second day following. There was testimony to the effect that this exchange was completed before Mr. Rishell intended it should be done.

"It was alleged in the amended complaint that the bank, with certain of the other defendants charged, joined in making the representations as to value but the evidence does not show that to be a fact. It was not shown that the bank had any knowledge of the value of the bonds or the value they were considered to have by the officers or directors of the Bay

Cities Association or that it made any representations concerning them. It does not appear that the bank was under any duty to investigate the value of the bonds or to make inquiry as to any representations that may have been made concerning the same. The fact that the Lloyd Association was qualified as a guarantee stock building and loan association was an implied representation that, at the time it received its license to do business, it had a paid-in capital of at least one hundred thousand dollars. The representation of the bank to the building and loan commissioner was that the capital of the association in the amount of one hundred and twenty thousand dollars consisted of cash on deposit in the bank. The officers and directors of Bay Cities Association presumably knew what was required in order to qualify the Lloyd Association. They did not, however, purchase the Lloyd Association stock under the belief that the latter association possessed any cash or any capital assets other than the bonds. They, therefore, were not deceived as to what the assets were.

''Several other questions of fact were presented which we think should have been submitted to the jury. These related to questions of proximate cause and reliance by Bay Cities Association upon the different representations made. It did not necessarily follow, as a natural or probable result of the fraud in procuring the permit that someone would purchase the assets of the Lloyd Association for twice their real worth. According to the complaint, Bay Cities' purchase was made in reliance upon the represented value of the assets. Plaintiff's evidence tended to show that Bay Cities relied upon express representations as to the value of the bonds themselves. If such values had not been misrepresented, or the bonds had been worth the full price paid, plaintiff would have sustained no substantial damage, for there was no representation at any time that the property purchased was worth more than the price paid. Again, it appears that Bay Cities Association made an independent investigation of the value of the bonds, and superficial as that investigation may have been, it does not appear that the purchaser did not to some extent rely thereon.

''Respondent contends that these are immaterial facts; that the parties are joint tort-feasors and that the value of the bonds is material only as affecting the question of dam-

ages. He takes the position that the bank's participation in the fraud, in obtaining the permit, directly induced Bay Cities to buy, as without a permit it would not have bought. We may concede the last statement to be correct but we do not agree that the representation as to the value of the bonds does not go to the question of the right to recover as well as to the measure of damages. Each fact, which, to a greater or less extent, induced the Bay Cities' purchase is not necessarily the proximate cause of its damage.

"The question of proximate cause is one for the jury in every case where there is room for a reasonable difference of opinion.

" 'Thus, where the facts of the particular case are disputable, and are of such character that different minds might reasonably draw different conclusions therefrom, a question of fact is presented properly determinable by the jury. . . . So where the rule of intervening efficient cause is relied on by the defendant, it is ordinarily a question for the jury whether there was such an intervening efficient cause as would prevent the negligent act or omission of the defendant from being the proximate cause of injury. . . . Where it is claimed that the defendant's act was not the proximate cause of injury because the result could not reasonably have been foreseen, it is ordinarily a question for the jury whether the result should reasonably have been foreseen.' (22 R. C. L. 148–150.)

"Where different conclusions may be drawn from the evidence as to whether the act is the proximate cause of injury or damage, the question should be left to the jury. (*Mansfield* v. *Eagle Box & Mfg. Co.*, 136 Cal. 622 [69 Pac. 425]; *Anderson* v. *Seropian*, 147 Cal. 201 [81 Pac. 521]; *Elder* v. *Rose*, 63 Cal. App. 545 [219 Pac. 74]; *Kreitzer* v. *Southern Pacific Co.*, 38 Cal. App. 654 [177 Pac. 477].)

"We are of the opinion that it cannot be said, as a matter of law, that the loss was sustained as a natural and probable consequence of the representation joined in by the bank that Lloyd Association held a valid permit or the representation that it had in the bank one hundred and twenty thousand dollars, at the time the permit was issued. There was sufficient evidence upon which the jury might have decided either that Bay Cities Association did, or that it did not, part with its property as the direct and proximate result of the repre-

sentations made solely by and on behalf of the Lloyd Association. These were questions of fact which the jury should have been allowed to decide.

"Because the bank, through the use of the certificate of deposit, made it possible for the Lloyd Association to sell its stock as that of an operating building and loan association, it does not follow that it thereby became responsible for distinct and independent frauds, consisting of representations in which the bank did not participate, or which it could not reasonably have anticipated would be made. Whether it should have anticipated the acts of the other defendants was a question for the jury. The fact that without participation on the part of the bank the loss would not have been sustained, is not sufficient to prove as a matter of law that the fraud in which the bank did join, was the proximate cause of the loss.

"Another point, unrelated to those already discussed, is that it is open to question whether the representations as to the value of the bonds and other assets were statements of fact or mere expressions of opinions. We cannot say that the jury could not have classed them as opinions only. (*Meeker* v. *Cross,* 59 Cal. App. 512 [211 Pac. 229]; *Coleman* v. *Dawson,* 110 Cal. App. 201 [294 Pac. 13]; *Reton* v. *J. D. Millar Realty Co.,* 132 Cal. App. 708 [23 Pac. (2d) 419].) Lloyd and Commagere were not shown to have had or claimed to have any peculiar or special knowledge regarding the bonds. Bay Cities was not hindered in any way in making a full and independent investigation. No claim is made of any representation of fact in that transaction, aside from the statements as to the value of the bonds. We think the jury should have been allowed to decide whether the representations as to values were more than expressions of opinion. Upon the whole evidence we cannot say that there could not be a reasonable difference of opinion on that issue.

"Furthermore, the question of the fraudulent nature of the statements was in issue. There was no evidence which would compel the conclusion that the representations were made in the knowledge that they were untrue or were not warranted by the information of those by whom they were made. We · cannot say that the information given Commagere by Alvin H. Frank and Company was legally insufficient to justify a reasonable belief that the bonds were worth par.

The evidence upon this issue of fraudulent intent called for its submission to the jury.

 "Elwood Lloyd was a director of Bay Cities at the time of the transaction. Respondent argues that because of his fiduciary relationship to his company he owed it a duty which he breached by his failure to make a full and fair disclosure of all the facts which might have had an influence upon his company's decision. There can be no doubt as to the correctness of this position. The fact of the fiduciary relationship, however, is not needed to show the culpability of Lloyd in concealing the circumstances under which the permit was issued and in failing to disclose that Lloyd Association had no assets, either in money or bonds. So far as Lloyd is concerned his breach of duty to his company gave rise to a cause of action against him regardless of the motives that prompted his actions, but this fact does not alter the views we have expressed upon the other points decided. There was no evidence that the bank knew that Lloyd was a director of Bay Cities. The fiduciary relationship was an important fact in the proof required to show the liability of Lloyd, but the same measure of proof is not applicable to the case of the other defendants. The liability of the bank must depend upon actual fraud or upon participation with guilty knowledge in the breach of duty of the fiduciaries of Bay Cities.

 "Appellants call attention to certain particulars in which the allegations of the amended complaint differ from those of the original complaint and maintain that a new and different cause of action is stated in the amended complaint. This argument is addressed to the proposition that the action was barred by the statute of limitations before the amended complaint was filed. It is unnecessary to discuss this point with particularity. Appellant bank was made a defendant by the original complaint. Each complaint set up the same transaction and sought recovery of damages. The amended complaint was but an amplification of the original. A change of theory as to the basis of recovery or as to the measure of damages is not a change of cause of action or the substitution of a new and different action for the original. (*Hutchinson* v. *Ainsworth*, 73 Cal. 452 [15 Pac. 82, 2 Am. St. Rep. 823] ; *Frost* v. *Witter*, 132 Cal. 421 [64 Pac. 705, 84 Am. St. Rep. 53] ; *Doolittle* v. *McConnell*, 178 Cal. 697 [174 Pac..

305]; *Phillips* v. *Stark,* 186 Cal. 369 [199 Pac. 509]; *Babcock* v. *Jewell,* 110 Cal. App. 323 [294 Pac. 30].)

"Appellants' contention that the cause of action involved did not pass to the plaintiff, as trustee in bankruptcy of the estate of Bay Cities, is answered adversely by the decisions in the following cases: *In re Landis,* 41 Fed. (2d) 700 (C. C. A.); *Morris* v. *Standard Oil Co.,* 200 Cal. 210 [252 Pac. 605]; *Wikstrom* v. *Yolo Fliers Club,* 206 Cal. 461 [274 Pac. 959]; *Jackson* v. *Deauville Holding Co.,* 219 Cal. 498 [27 Pac. (2d) 643]; *Connolly* v. *National Surety Co.,* 35 Ohio App. 76 [171 N. E. 870]; *In re Gay,* 182 Fed. 260; *In re Harper,* 175 Fed. 412.

"Appellants urge the defense of estoppel. Briefly stated, the foundation of this defense is that Bay Cities knew it had been defrauded for some two years before it brought this action; that it made no complaint in the meantime, ratified the transaction by its silence and by allowing transfers to be made of some of the certificates which it had parted with, recognized the validity of the certificates and redeemed some of them; that in the meantime Bank of America acquired the assets of Merchants National Bank in a consolidation without knowledge of the Bay Cities' claim against Merchants National. A statement of the grounds of the claimed estoppel is sufficient to disclose its entire inadequacy.

"Bay Cities was under no obligation to appellants to disclose or prosecute its claim against Merchants National Bank. It was not shown to have had knowledge of the purchase of Merchants National by appellant Bank of America. No occasion called for an assertion of its claim and hence its silence was not culpable. No injury to appellant Bank of America was either alleged or shown and no action was taken by that appellant that was induced by its want of knowledge of the facts. The court correctly held the defense of estoppel to be unsustained. (10 Cal. Jur. 654.)

"The further argument that Bay Cities should have recouped its loss by questioning the validity of the certificates transferred by Alvin H. Frank and Company to innocent purchasers and attempting to throw the loss upon them does not tempt us to so rule. Its loss was fixed when it parted with its property. (*Hines* v. *Brode,* 168 Cal. 507 [143 Pac. 729].) It was not obliged to engage in litigation with its certificate

holders who were the innocent victims of the fraud. (*Knight* v. *Linzey,* 80 Mich. 396 [45 N. W. 337, 8 L. R. A. 476].)

"The liability of appellants was not established by evidence of that conclusive nature necessary to warrant an instructed verdict, and appellants therefore were deprived of the right of jury trial."

The judgment is reversed.