[Civ. No. 16806.   Second Dist., Div. One.   June 9, 1949.]

HALLIE H. BIGGS, Respondent, v. DEMITRIOS TOURTAS et al., Appellants.

John C. Miles and Sanford Sill for Appellants.

Holcomb & Kempley for Respondent.

DRAPEAU, J.—This is an action to recover damages for unlawful eviction; for personal injuries sustained in an assault and battery committed upon plaintiff by defendants in furtherance of the eviction; and for treble damages for excess rent paid by plaintiff.

The amended complaint alleges in substance that plaintiff rented the house from defendants, and that while in lawful possession thereof, the defendants conspired to unlawfully evict her therefrom; that they accomplished such eviction and in the course thereof plaintiff received severe personal injuries. Said complaint further alleges that defendants de-

manded of her and she paid rental to the extent of $75 in excess of the ceiling fixed by the rules and regulations of the Office of Price Administration.

The answer denies the allegations of the amended complaint, and sets up a cross-complaint seeking to recover damages on behalf of Helen Tourtas for personal injuries therein alleged to have been unlawfully inflicted upon her by the plaintiff.

The court found in favor of plaintiff on all issues and against defendants on the issues raised by their cross-complaint.

This appeal is prosecuted from the judgment which awards the sum of $7,775 to plaintiff, to wit:

On the unlawful eviction: $2,000 compensatory and $500 exemplary damages;

For personal injuries: $4,000 compensatory and $1,000 exemplary damages;

Excessive rent $75 trebled: $225 plus $50 attorney's fees allowable under the Rent Control Act.

Appellants rely upon the following propositions for a reversal of the judgment:

(1) That there is an absence of any evidence that Demitrios Tourtas or Theodore Tourtas (a) were present at the alleged assault, or aided, abetted, encouraged or conspired in it; (b) encouraged or conspired in the alleged eviction;

(2) That there was no eviction of respondent for the reason that she vacated the premises voluntarily before her lease went into effect;

(3) That the tender of the $200 to respondent prior to the time the lease went into effect cured any possible violation of the Rent Control Act;

(4) That the judgments rendered for the alleged assault and eviction in the form of compensatory and exemplary damages are excessive and not supported by the evidence.

■ Appellants are father, mother and son. The house involved was owned originally by the son, who at the time of his induction into the Army during the late war, deeded it to his father. The father and mother operated a café at Santa Monica, where respondent lived, and they became acquainted about a month prior to April 25, 1946. On that date, respondent rented appellants' house, paying $200 cash for the rent for one month beginning May 1, 1946, and the father gave her a receipt therefor. At this time, Mr. and Mrs. Tourtas invited respondent to take possession of the house

at once, because the glass in the back door was broken and the place was unprotected. Respondent told them she would move in if she could get someone to help her clean the place. As a result, she did take possession of the house on April 26th with the help of a Mrs. Haverly and Mrs. Tourtas.

The son, Ted Tourtas, arrived at the house that afternoon while respondent was unloading her personal effects from a trailer, and he later rode to Santa Monica with respondent where she went to get additional keys to the house which Mrs. Tourtas had neglected to give her. Ted did not say anything to respondent that day about her renting the house because he wanted to talk to his father and mother first.

On Saturday morning, April 27, 1946, Mrs. Tourtas came into the kitchen of the house between 9:30 and 10 o'clock and asked respondent for the rent receipt, stating: "My son is in the yard and you know we don't own this house and he would like to see your receipt, to see how to spell your name." Whereupon respondent turned the rent receipt over to Mrs. Tourtas, who then left, but shortly after returned and asked respondent for the door keys, so that her son could have duplicates made. Respondent got the keys and gave them to Mrs. Tourtas who again went out of the house into the yard. A few moments later Ted, Mrs. Tourtas and her son-in-law, Mr. Morgan, came in and Ted said to respondent: "Mrs. Biggs, my mother and father rented the house, and I don't want you here, and I will give your $200 back." Respondent refused to take the money and said, "Ted, if you don't want me here, I won't stay here, but I have to have time to find another place to move, so I will just take my receipt back. And he said, 'No, you cannot have the receipt back . . . I am going to call my lawyer and see if I cannot have you arrested for gaining entrance. . . . Because you have nothing to show you have a right to be here.' . . . I said, 'I have to find a place to stay, I have to stay long enough to find a place to move, I cannot just move out now', and I was very nervous and upset. . . . Then he took the $200 and then they all three left the house."

Five or ten minutes later, Mrs. Tourtas returned to the house and picking up a child's high chair walked out to the front of the house; when respondent and Mrs. Haverly reached the front hallway, Mrs. Tourtas "had a box and the high chair sitting on the front porch and the electric percolator and the waffle iron under her arm" as she proceeded through the front door. Respondent said, "Mrs. Tourtas,

what are you doing''; to which the latter replied: "I am throwing you out. . . . You have nothing to show you have a right to be here, and we have a truck out in front . . . and I said 'You cannot throw me out like this,' . . . And she turned and came toward me with the electric percolator raised to the air, and as she came down with it I blocked the blow, and that knocked the percolator to the floor, broke it, and I stooped over to pick the percolator up, and as I straightened up she hit me on the side of the face with her fist, and I said, 'Mrs. Tourtas, don't do that, don't hit me again,' and walked past her and set the high chair back into the house. . . . and then I closed the door, and then she grabbed me by the head of hair on the back of the head and there the tussle started. . . . she pulled hands of hair; and she grabbed me, and the first place she bit me was on the hand, the big part of the hand. . . . she bit my wrist, she bit my arms in several places. . . . She bit me, the big part of the thumb off; . . . A big hunk out at the wrist; . . . she bit pieces out of my elbow, two hunks, . . . Then there were places where she had grabbed hold of me and the teeth would not sink in.''

Pictures taken at the police station showing respondent's injuries were introduced in evidence, and respondent exhibited to the court scars of the places where she was bitten on the hand and arm.

During the struggle, the two women fell to the floor, and respondent, who was "trying to jar loose with my elbow" asked Mrs. Haverly to go for help. The latter went out on the porch and screamed, whereupon Ted Tourtas, Mr. Morgan and a strange man came in, and Ted helped the women to their feet, whereupon in the words of respondent: "She (Mrs. Tourtas) made one dive at me, and that was when she made the laceration on my breast with her fingers. . . . she made two or three bad lacerations on my right breast. . . . Then I asked Blanch (Haverly) to help me upstairs and lock us in a room with the babies and go for help. From then on my memory is very dull up to the time when I came to myself, she was wiping my face with a white cloth and Mrs. Tourtas and Ted were standing in the bedroom, they had followed us up the stairs.''

Respondent's daughter was summoned from her place of business and took her mother to a doctor for medical treatment.

On the evening of April 27th, Mr. Tourtas, Ted and other members of the family returned to the house, walking in with-

out knocking or ringing the doorbell, at which time Ted Tourtas ordered respondent and her family to vacate the house. Mr. Tourtas told respondent he would give her until 8 o'clock Monday evening to get her things out. She moved on Sunday, April 28th but no part of the $200 rental was ever returned to her. Respondent further testified that her "arm hung limp, useless, for better than three months," and that she was not able to do anything for "better than a year."

Dr. J. de Costa Meyer testified that he examined respondent around 11 o'clock on April 27, 1946, and found multiple lacerations on the left wrist, forearm and elbow which appeared to have been made by tooth marks. On the right breast, the lacerations were parallel and looked more like long scratch marks. In addition there were multiple contusions, and the patient was in a state of acute nervous collapse; that he took preliminary care of the injuries by means of antisepsis and dressing and by tetanus inoculation, also phenobarbital and sedation for acute nervousness; that the patient returned on June 1, 1946, at which time she still had residual symptoms of nervousness, and considerable aching in the left scapular, lower neck and left shoulder and arms; that he took a series of X-rays which were negative for any bone pathology; that his assumption at the time was that he was dealing with a probable ligamentous strain, rather severe, but simple, and one which would eventually subside entirely; that he advised her on the telephone from time to time and on June 10th, he made note that she was definitely improving; that the patient made four visits to his office for which she paid him $51.

Appellant Ted Tourtas gave his version of the occurrence of April 27th as follows: That he told his mother to go in to the house and give the respondent the money and get the receipt, so he could confer with the O.P.A.; that he found out that she had moved in before the time, and he wanted to contact his attorney; that his mother returned with the receipt but said respondent refused to take the money; that he asked his folks about the rental on Friday night and his mother told him she had heard that respondent was going to make a rooming house out of the place, and that was the reason he went there on Saturday morning. That he made two telephone calls at a neighboring market, and as he was returning to the house with his brother-in-law, a neighbor, Clyde Barmore, called to them and said, "There's trouble down there, help me!" That the witness started running to the house to see what had

happened, and as he walked in he saw respondent "had my mother straddled, she had her two fists full of hair and she was banging her head into the floor." That he picked both women up and asked respondent what she had done to his mother; that respondent said, "Ted, I had to fight to get back what I gave you willingly"; that he gathered his mother up and took her to a doctor.

The participants in the affray both contend that the other was the aggressor, appellant Helen Tourtas claiming that she received much more serious injuries than respondent.

As was stated in *Campbell* v. *Birch*, 19 Cal.2d 778, 789 [122 P.2d 902] : "The trial court is the exclusive judge of the weight of the evidence and the credibility of the witnesses. It is its province to give to the evidence that weight to which, in its judgment, it is entitled, and to draw all reasonable inferences therefrom, and if, in its judgment, the evidence is entitled to no weight, it may disregard such evidence altogether. (24 Cal. Jur. 886, sec. 135.) ▮ The cases have frequently taken notice of the fact that it is next to impossible to secure direct evidence of a conspiracy, unless one of the participants has confessed, and that the proof must usually be inferential and circumstantial. Thus, in *Johnstone* v. *Morris*, 210 Cal. 580, 590 [292 P. 970], it is stated: '. . . The jury may infer the conspiracy from all the circumstances, and if the inference is a reasonable one it will not be disturbed on appeal. These principles have repeatedly been recognized by this court. In *Revert* v. *Hesse*, 184 Cal. 295, at 301 [193 P. 943, 946], this court, quoting from a Georgia case, said : ' "The law recognizes the intrinsic difficulty of proving a conspiracy. The allegations with reference to conspiracy are treated as matters of inducement leading up to a more particular description of the acts from which the conspiracy may be inferred. . . . The conspiracy may sometimes be inferred from the nature of the acts done, the relation of the parties, the interest of the alleged conspirators, and other circumstances." ' "

▮ Moreover, it is a general and well-settled principle of law that "where two or more persons are sued for a civil wrong, it is the civil wrong resulting in damage, and not the conspiracy, which constitutes the cause of action. . . . In an action for damages resulting from acts of conspirators, the major significance of the conspiracy lies in the fact that it renders each participant in the wrongful act responsible as a joint tort-feasor for all damages ensuing from the wrong, irrespective of whether or not he was a direct actor and re-

gardless of the degree of his activity.'' (5 Cal.Jur. §§ 29, 30, pp. 528, 530.)

Again, in *Wells* v. *Lloyd*, 6 Cal.2d 70, 82-83 [56 P.2d 517], it is stated: ''It is to be conceded, that where a conspiracy exists, none of the conspirators are to be exonerated merely *because the means employed to accomplish a common purpose were unknown or unanticipated in the beginning*, or because they did not join in or know of the acts of their coconspirators, or because the object accomplished differs from the one originally contemplated. . . .

''It is of the essence of a conspiracy that the parties should have a common purpose or design. Whether the defendants conspired together for any purpose, and if so, what that purpose was, were questions of fact.''

As is usual in cases of this character, the testimony of the parties is conflicting in many respects. However, it is well established that an appellate court in reviewing the evidence in support of the judgment must accept as true that which is most favorable to the respondent and disregard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact. (*Estate of Teel*, 25 Cal.2d 520, 527 [154 P.2d 384].)

An examination of the evidence presented at the trial herein and very briefly recited in the foregoing résumé, discloses that the findings of the trial court to the effect that the appellants wrongfully, unlawfully, fraudulently and maliciously conspired together to evict respondent and her family from the said dwelling and that such eviction was accomplished through the use of great physical force and violence resulting in injury and damage to respondent,— are amply supported by such evidence. It follows that under the principles of law heretofore enunciated, each participant in the conspiracy became liable for all damages ensuing from the wrong regardless of the degree of his activity. (5 Cal.Jur. § 30, p. 530.)

With respect to appellants' contention that there was no basis for the trial court to determine a maximum rental under the rules and regulations of the Office of Price Administration, there was direct evidence that the house had been rented previously for $125 per month, and that it had never been registered with the rent control office.

In connection with their final point that the judgment is excessive, appellants urge that they do not wish to imply that the trial judge was influenced by passion or preju-

dice, but rather that he was laboring under a misapprehension of the facts, i. e., that Mrs. Tourtas "actually bit Mrs. Biggs right in the breast." While it is true that this comment was made at the time of the denial of appellants' motion for a new trial, that is no indication that the amount of damages awarded at the conclusion of the trial had any basis in such belief.

Apropos of this phase of the case, the following appears in *Willoughby* v. *Zylstra*, 5 Cal.App.2d 297, 302 [42 P.2d 685] : "In respect to appellants' claim of excessive damages, it is the recognized rule in this state that before a reviewing court may set aside a verdict as excessive it must appear that the amount awarded by such verdict is so grossly disproportionate to any reasonable limit of compensation warranted by the facts as to shock the sense of justice and raise at once a strong presumption that it is based on prejudice or passion rather than sober judgment. (*Ware* v. *McPherson*, 213 Cal. 120 [1 P.2d 433] ; *Hart* v. *Farris*, 218 Cal. 69 [21 P.2d 432].) The fact that the trial court denied a motion for new trial on the ground of excessive damages, among others, is persuasive and confirms us in our conclusion from a review of the record that the verdicts herein may not be declared excessive."

Tested by this rule and taking into consideration the facts disclosed by the record herein, the award of damages in this case is not excessive.

For the reasons stated, the judgment is affirmed.

White, P. J., and Doran, J., concurred.

A petition for a rehearing was denied June 27, 1949, and appellants' petition for a hearing by the Supreme Court was denied August 4, 1949. Schauer, J., voted for a hearing.