[Civ. No. 20428. Second Dist., Div. Two. June 3, 1955.]

BROADWAY FEDERAL SAVINGS AND LOAN ASSOCIATION (a Savings and Loan Association), Respondent, v. H. A. HOWARD, Appellant.

Eric A. Rose for Appellant.
Sylvester Hoffmann for Respondent.

FOX, J.—Plaintiff recovered judgment for (1) $17,667.46 against H. A. Howard,[1] alone; (2) $1,090.41 against Howard and Avalon Enterprises, Inc., jointly and severally, and (3) $5,581.18 against Avalon Enterprises, Inc., alone. No recovery was awarded against Dorothy B. Howard, wife of Howard. By the judgment the cross-complaint of the Howards was dismissed, plaintiff's demurrer thereto having been sustained without leave to amend. Mrs. Howard has not appealed. The appeal of Avalon Enterprises (hereinafter referred to as Avalon) has been dismissed. This leaves Howard as the only appellant.

By its third amended complaint[2] plaintiff sought to recover asserted secret profits which Howard made in a variety of transactions[3] in which he made use of plaintiff and its assets, fraudulently, however, concealing his identity in these transactions from plaintiff and its board of directors.

In a memorandum ruling the trial judge summarized Howard's relation to plaintiff and his general modus operandi as follows: "The defendant Howard for more than 25 years has been a real estate broker. His clientele for the most part has been the members of the colored race. Sometime prior to November, 1946, he concluded that a federal savings and loan association would not only be a valuable adjunct to his business, but would serve the needs of his community. With that in mind he applied to the Home Loan Bank Board at Washington for a charter under the name of Broadway Savings and Loan Association. This was granted in November, 1946. The association opened for business in January, 1947, with a board of five directors. The defendant was not only a director but the president and general manager of the association. It is undisputed that he was the dominant figure in the association until he was ousted in September, 1949, at the instance apparently of the National Home Loan Bank Board.

The defendant Avalon Enterprises, Incorporated, is wholly

[1]H. A. Howard is also known as Herbert A. Howard, and sometimes referred to herein as Howard.

[2]This pleading is more than 100 pages in length.

[3]Thirty-four counts are pleaded. However, counts 8, 10, 23 to 30, each inclusive, 33 and 34 were abandoned and dismissed. The findings and judgment, apparently by inadvertence, fail to enumerate count 32 as one of the counts that was abandoned and dismissed. The reporter's transcript, however, is clear that this count was in fact abandoned. The proceeds from the transactions alleged in counts 12 and 13 were traced to Avalon but not to appellant.

owned by the defendant Howard and wife. It was employed by the plaintiff prior to September, 1949, to supervise and disburse some of the loans made by plaintiff to individual borrowers who were constructing their own homes.

"The ability of the defendant Howard to make use of the lending powers of the plaintiff was severely restricted by the charter and the federal laws and regulations pertaining to federal savings and loan associations. He was prohibited, among other things, from borrowing money from the association except for a single loan on a home or combined home and business establishment occupied by him,[4] or from selling loans to the association.[5]

"As the defendant was engaged as a real estate broker in buying and selling on his own account notes secured by either first or second trust deeds or mortgages, in providing real estate loans for persons who wished to buy property listed for sale or exchange with or owned by the defendant Howard, he found himself considerably handicapped in dealing with the association. He surmounted that difficulty in large part by operating in the names of third persons, at times with their consent, and sometimes without such consent or knowledge. Without disclosing the manner in which he was operating to the board of directors he approved as president and general manager loans or purchases of existing trust deeds or mort-

[4]*Rules and Regulations* for the Federal Savings and Loan System, chapter I(C), title 24, Code of Federal Regulations (1949 ed.), of the Home Loan Bank, issued and promulgated pursuant to section 5, subdivisions (a) and (d), Home Owners Loan Act of 1933, as amended provide:

"Section 143.10, sub. (i) *Loans to directors, officers, or employees.* A federal association may not make a real estate loan to a director, officer or employee of the association . . . : *Provided,* that nothing herein shall prohibit a Federal association from making loans on the security of a first lien on the home or combination of home and business property owned and occupied by a director, officer or employee of an association. . . .

"Sec. 143.10, sub. (k) *Initial loan charges.* No director, officer, or employee of a Federal association . . . may receive from the association or from any other source any fee or other compensation of any kind in connection with the procuring of any particular loan from or by such association. . . ."

These rules and regulations have the force and effect of law and are judicially noticed. (Code Civ. Proc., § 1875, subds. 2 and 3; 44 U.S.C.A. §§ 301-314; *Home Owners' Loan Corp.* v. *Gordon* (1937), 36 Cal.App.2d 189 [97 P.2d 845]; *Livermore* v. *Beal* (1937), 18 Cal.App.2d 535, 541, 542 [64 P.2d 987]; *Woodard* v. *Broadway Fed. S. & L. Assn.,* 111 Cal. App.2d 218, 223 [244 P.2d 467].)

[5]Paragraph 145.6-5. *Purchase of Loans.* This paragraph of the rules and regulations provides: "Any Federal association may purchase loans of any type that it may make; . . . PROVIDED, That no loan may be purchased . . . from a director, officer or employee of such association, . . ."

gages and as a director voted approval of such purchases or loans in which he had a beneficial interest. These activities on the part of the defendant Howard were directly contrary to the Rules and Regulations issued by the Home Loan Bank Board.

"The plaintiff having ascertained on or sometime subsequent to September 1949 the factual situation it filed its action. The third amended complaint . . . sets forth various transactions in which the purchasing or lending powers of the association were employed by the defendant Howard in achieving secret profits of various kinds for which recovery is sought. . . ."

These views of the trial judge were carried into the findings in substantially the foregoing language.

The court further found that in numerous transactions the lending powers of the association and its powers to purchase loans were employed by Howard in making secret profits; that in certain of these transactions defendant caused to be acquired at a substantial discount promissory notes secured by trust deeds with the intent on his part to have such instruments paid for by the association at their face value and to personally receive the profit without the knowledge of the association, and that he was successful in so doing; that Howard concealed his identity and personal interest in these transactions from the plaintiff. In some of these transactions this concealment was effected through the use and identification of F. Marie Shaw, Lillian Marie Russell, and Olivia Mae Daniels. None of these individuals had any personal interest in any of the transactions and acted therein "as the dummy, agent, nominee or alter ego of Howard." In handling these purchases, Howard caused the records of plaintiff to show that plaintiff made each such purchase directly from the holder, who endorsed the note and assigned the trust deed securing payment thereof directly to plaintiff. Howard did not appear of record to have any interest therein. In order to further conceal from plaintiff his interest, Howard sometimes caused his profit in such transactions to be paid by plaintiff to Avalon. In other cases he concealed the profit by a check made payable to one of his "dummies" or caused the check for his profits to be made payable to the seller or to some third person who had no connection with or interest in the transaction, without, however, the payee's knowledge or consent. Howard then "caused

such payee's name to be forged as an endorser and received the proceeds'' from such checks.

Findings IX and X read as follows: IX. "In none of the transactions could Howard have taken a profit but for his having caused the plaintiff to act within the scope of its corporate powers at some point in the transaction, and in none of those instances could be have so caused it to act but for his position as director, president and general manager.'' X. "Howard at no time used any of his own funds or credit in the purchase of the aforesaid notes, or in any of the transactions wherein he took a secret profit, and the profit he received was wholly through the use of the funds, facilities and corporate entity of plaintiff. In each instance Howard caused the plaintiff to act within the scope of its corporate powers and as a result enabled Howard to profit.''

The court also found that Howard purchased and sold certain real property in the financing of which transactions he made use of the plaintiff and its assets, in that the full purchase price was paid out of the proceeds of loans which he caused the plaintiff to make, each such loan being in an amount in excess of the cost of the property to Howard. He concealed from plaintiff his interest in these transactions by using the names of the persons hereinabove identified and of his real estate company, Avalon, and by means of multiple escrows. Howard never occupied, or intended to occupy, as a home or combination home and business, any of the property, the purchase of which he caused to be financed by plaintiff.

The court further specifically found that "Howard at no time used any of his own funds or credit in the purchase of such property.'' He retained the profit that was made on these transactions.

The court found that Howard, by the same devices as hereinbefore mentioned, procured loans from plaintiff for borrowers and received a fee or commission therefor, but concealed this fact from the association. The court also found that plaintiff did not discover any of the facts relating to its right of recovery from Howard or Avalon, or either of them, until the month of September, 1949, when a summary report of an audit made by the Home Loan Bank Board was presented at a meeting of plaintiff's directors. By reason of concealment, the court found that Howard and Avalon were estopped from urging or asserting the lapse of time as a defense to this action.

Similarly, the court found that Howard and Avalon were indebted to plaintiff for money had and received for its use and benefit in the amounts heretofore stated.

Howard contends, among other things, that there is no evidence of fraud, bad faith, unfair dealings or other acts on his part which support the findings and judgment. It is therefore necessary to briefly summarize the evidence[6] relative to the various transactions:

COUNT 1: In this transaction one Evans sold a note to plaintiff on which there was an unpaid balance of $1,462.70. He received from plaintiff $1,000, the amount of his demand. After paying the recorder's fee and escrow expense totaling $62.70 a check for the balance of $400 was made out, on Howard's instructions, to C. R. Ransom, who was a real estate broker. There is no evidence that Mr. Ransom had ever met Evans or that he was entitled to a commission from plaintiff. Although the check bore the endorsement "C. R. Ransom" it was not, in fact, his signature and he received no funds therefrom. This check was cashed by plaintiff and the proceeds were given to Howard in cash.

COUNT 2: Amy Gaither listed her property for sale at Howard's real estate office. Howard, acting through Marie Shaw (described in his brief as the "undisclosed agent of defendant"), opened Escrow No. 1265 in plaintiff's escrow department for the purchase of Mrs. Gaither's property by Marie Shaw for $4,750. Simultaneously, Miss Shaw made application to plaintiff for a loan on the Gaither property of $5,250. Loan File 168 was opened in plaintiff's loan department. Miss Shaw's application falsely represented that she then owned the property and that she had paid $7,950 for it. The $5,250 loan was granted and the proceeds were transferred from Loan File 168 to the Gaither-Shaw escrow, No. 1265, and Gaither received her sales price out of the funds Shaw had borrowed from plaintiff. Miss Shaw received plaintiff's check for the remaining unexpended loan funds from the escrow in the amount of $430.03. She endorsed the check and deposited it in Howard's bank account at his request.

In a couple of weeks, Mrs. Searles visited Howard's real estate office in search of property to purchase. At Howard's direction, Escrow 1371 was opened in plaintiff's escrow de-

[6]The evidence is viewed, as it must be on appeal, in the light most favorable to the successful party, in the trial court. (*Leming* v. *Oilfields Trucking Co.*, 44 Cal.2d 343, 346 [282 P.2d 23].)

partment for the sale of the former Gaither property by Miss Shaw to Searles et ux. for $8,500 on the following terms: $1,500 cash, assumption of the loan to Miss Shaw, and a second trust deed for the balance. At the close of the escrow a note secured by a second trust deed of $1,802.63 pyable to Miss Shaw, was delivered to her as the balance of the purchase price, together with plaintiff's check in her favor for the remaining portion of the cash payment made by Searles of $1,475. This check was endorsed by Miss Shaw and deposited in Howard's bank account. She also sold this note to plaintiff about a year later, and the proceeds therefrom were received by Howard. Howard made approximately $3,700 out of the various phases of this transaction.

COUNT 3: A secured note in favor of Green et ux., on which there was an unpaid balance of $4,198.23, was endorsed and delivered by them to plaintiff. Howard personally approved the transaction as a member of plaintiff's loan committee. The Greens received $3,100, the amount of their demand; $495 was used to pay plaintiff's loan fee and expenses. The remainder was paid by a check for $598, as a "commission" to Emma Morris, a real estate broker. Mrs. Morris, however, never knew anything about the transaction and did not represent any party to it. The check was endorsed "Emma Morris" but she testified it was not her signature. It was then cashed by plaintiff.

COUNT 4: Howard purchased from a church a secured promissory note, having an unpaid balance of $4,800, for $2,400. He sold the note to plaintiff at face value. Four hundred dollars was paid plaintiff "as an office charge." In his brief Howard admits that "$2000.00 was paid to and received by him" in this transaction. It was handled in the name of Olivia Daniels, who was employed in his real estate office.

COUNT 5: Howard purchased a note secured by a trust deed from one Whisenant for $3,000 and then sold it to plaintiff "at face value." He admitted a profit of $1,200 on the transaction. The checks, however, in payment of this profit were made in the name of one Knighten, a real estate broker, who had no personal connection with the deal and who did not in fact endorse the checks.

COUNTS 7 and 16: (Same transaction but different theories.) In this transaction Mrs. Blodgett purchased a $10,000 property which she occupied as a tenant. She arranged through Howard to have the full purchase price financed by plaintiff.

As it was necessary for her to leave Los Angeles on business, she authorized a Mrs. Cleveland, since deceased, to handle the transaction for her. Through a series of three escrows and a loan of $11,750 by plaintiff the purchase was consummated. Twelve hundred dollars ($1,200) of this amount was represented by a check to Mrs. Cleveland. Mrs. Blodgett did not authorize plaintiff to make such payment to her. The endorsement on the check was not that of Mrs. Cleveland. Howard was the last endorser and received the proceeds of the check.

COUNT 9: Howard purchased a promissory note secured by second trust deed on which there was an unpaid balance of $4,081.41 from one Mosby for $3,000. Plaintiff then purchased the note from Howard at face value. Howard admittedly received $834.41 out of the deal. This amount was represented by two checks: one for $700 and one for $134.41, both payable to Mosby, who, at Howard's request, endorsed them and handed them back to Howard.

COUNT 11: Through his agent, Marie Shaw, Howard purchased property owned by one Murray for $4,836.66. Then, also through Miss Shaw, he applied for and received a loan from plaintiff of $7,500 on the property based upon an appraisal of $11,500 which the loan committee of plaintiff approved. The application for the loan was in Howard's handwriting and misrepresented, the purchase price. A check out of these funds for $2,604.84 in favor of Marie Shaw was signed by Howard who admits he received the proceeds thereof.

COUNTS 14 and 15: In this transaction Howard bought property from one Williams through and in the name of his agent, Lillian Russell, for $5,500. Plaintiff made a loan on this property of $10,000 which included improvements in the sum of $2,500. Miss Russell authorized payment out of the escrow of $275 as a "commission" to Marie Shaw, another of his agents. Although Miss Shaw worked in Howard's real estate office, her residence address was given. A check for $540.50 was issued to Miss Russell out of this escrow. At Howard's request she endorsed the check, had it cashed, and gave the proceeds to his bookkeeper, Marie Shaw. Howard admits receiving the proceeds of these checks. A third check for $660 was drawn against the funds in this escrow in favor of Paul Hairston. He never saw the check; the endorsement was not made by him; and plaintiff was not indebted to him in any amount.

COUNT 17: In this rather complicated transaction it ap-

pears that Bertha Lee Jenkins and her husband were interested in buying a piece of property that was in an estate for $8,750. They had $2,500 and went to Howard to borrow the difference. He agreed to arrange the loan to them from plaintiff. The loan of $7,500 was made to Lillian Russell, Howard's agent, who did not own the property, and assigned by her to plaintiff. Funds were then transferred from this loan to a Russell-Jenkins escrow and from this escrow to a Jenkins Estate escrow and the sale to the Jenkinses was consummated and confirmed by the probate court. Marie Shaw received a check for $439 as a "commission" out of this transaction, and Lillian Russell a check for $772.75. The endorsement, however, was not Miss Russell's. Howard admits receiving the proceeds of both of these checks.

COUNT 18: Howard bought certain real property from one Jackson, taking title in the name of his agent Marie Shaw, who resold the property to Mae Lacy. A loan of $9,000 was made on the property by plaintiff. A check signed by Howard in favor of Marie Shaw for $1,089.95 was drawn against the funds in the escrow. She endorsed and cashed the check, and at his request deposited $1,000 of the proceeds in his bank account and put the balance in his cash drawer.

COUNT 19: Leola Wilson owned a note secured by a second trust deed having an unpaid balance of $5,223.93. Howard agreed to purchase the note from her for $3,900. An escrow was opened for the purchase of the note by the plaintiff. She executed an assignment of the note and trust deed directly to plaintiff, at Howard's request. She also authorized payment out of the escrow of $1,082.18 to F. E. Johnson, whom she did not know. A check in that amount was signed by Howard in favor of Mr. Johnson. Howard, however, admits that the proceeds of this check were received by him.

COUNT 20: The Glicksteins owned a vacant lot and entered into an escrow at plaintiff's office with Lillian Russell, Howard's agent, to sell it to her for $2,800. While this escrow was pending, Howard had Miss Russell enter into another escrow with Mrs. Levy and Mrs. Coleman for the sale of this lot to them for $3,300. A third escrow was then opened for a construction loan on this property by plaintiff to Levy and Coleman. Funds were transferred from this loan to the other escrows. All three escrows were closed on the same day. The net profit on this transaction was $432.55, represented by plaintiff's check to Miss Russell, whose endorsement was made by Miss Shaw. Howard admits getting the proceeds of this check.

COUNTS 21 and 22: (Same transaction but different

theories.) Howard, through his agent Marie Shaw, bought a parcel of realty from Foster and Dunn for approximately $4,330. To facilitate the purchase she entered into Escrow No. 1756. She then secured a loan from plaintiff for $5,750, for which purpose a second escrow, No. 1766, was opened between Miss Shaw and plaintiff. Miss Shaw's loan instructions were to pay the entire net proceeds of the loan escrow to the purchase escrow. Instead, only the net amount required to complete the purchase was transferred to Escrow No. 1756, and all the excess loan funds—$1,090.41— were paid to Avalon by plaintiff's check (signed on its face by Howard) and deposited in its account. At Howard's request and without explanation, Miss Shaw drew Avalon's check in favor of Howard, in the same amount, and deposited it in Howard's bank account.

COUNTS 6 and 31: Counts 6 and 31 are common counts for money had and received in the amount of $70,000. In these counts Howard's fiduciary relation to plaintiff is alleged. Count 31 incorporates by reference all of the other counts except Counts 6 and 10. It also alleges Howard's failure to disclose the facts of these transactions to plaintiff and that he "intentionally concealed" them from plaintiff.

The law is settled that one who is a director or officer of a corporation acts in a fiduciary capacity and the law does not allow him to secure any personal advantage against the corporation. (*Brainbridge* v. *Stoner*, 16 Cal.2d 423, 427 [106 P.2d 423].) It is admitted that during the time the transactions here in question took place Howard was a director, general manager, and president of plaintiff. Thus his fiduciary duty to plaintiff was established. A reading of the foregoing summary of the transactions amply supports the trial court's determination that Howard personally profited from them at the expense of plaintiff through the use of the association, its facilities and assets and that in so doing he violated his fiduciary duty to plaintiff. From the character of the transactions, the manner in which they were handled, together with the reasonable inferences to be drawn therefrom, and the testimony of Director Hudson, there is also ample support for the trial court's finding that Howard concealed his interest in these transactions from plaintiff and its board of directors and that the personal profits he thus made were unknown to plaintiff and its board and were secret in character. Under these facts, Howard's liability to plaintiff is unmistakably established. (*Farmers' & Merchants' Bank of*

*Los Angeles* v. *Downey,* 53 Cal. 466 [31 Am.Rep. 62];
*Fleishhacker* v. *Blum,* 109 F.2d 543 (cert.den. 311 U.S. 665
[61 S.Ct. 23, 85 L.Ed. 427]); *Western States Life Ins. Co.* v.
*Lockwood,* 166 Cal. 185 [135 P. 496]; *Angelus Securities Corp.*
v. *Ball,* 20 Cal.App.2d 436 [67 P.2d 158]; *Pasadena Mercan-
tile F. Corp.* v. *De Besa,* 122 Cal.App. 575 [10 P.2d 492];
*Industrial Indem. Co.* v. *Golden State Co.,* 117 Cal.App.2d
519 [256 P.2d 677]; *Blackburn's Adm'x* v. *Union Bank &
Trust Co.,* 269 Ky. 699 [108 S.W.2d 806].) Furthermore,
many of these transactions were in direct violation of the Rules
and Regulations for the Federal Savings and Loan System for
they represent loans on property which Howard was purchas-
ing but in which he did not reside. (See footnote 4, *supra.*)

Appellant attacks the testimony of Director Hudson to the
effect that he did not know of Howard's personal interest in
and profit from any of these transactions and that so far as
he knew other members of the board did not have any knowl-
edge of these matters, on two grounds: (1) that he was an-
tagonistic to Howard because he had been a defendant in
a number of suits brought by Howard and had taken the
latter's place as manager and chairman of the board of
plaintiff association; and (2) that his statement relative to
the lack of knowledge on the part of other directors that
Howard was interested in these transactions was hearsay.

■ The answer to the first charge is that it was the exclusive
province of the trial judge to determine the credibility of the
witnesses and the weight to be given to their testimony.

■ The charge of hearsay is not well founded for the ques-
tion, posed by the judge, only sought Hudson's personal knowl-
edge as to whether the other members of the board were aware
of Howard's interest in these deals. From Hudson's testimony
it is apparent that Howard did not acquaint the board with his
interest in any of these transactions when Hudson was present.

■ Appellant then argues that apart from Hudson's hear-
say testimony there is no evidence of concealment and that all
of the competent evidence is to the contrary, consequently
there is no support for the finding that Howard is estopped
to assert the limitations of time. There are two difficulties
with Howard's position. The first is that the trial judge
could reasonably infer concealment on the part of Howard
from: (1) the evidence that these transactions were carried
in the names of his agents and upon occasion in the names
of persons who were totally unaware of them; (2) the manner
in which the checks representing the profits in these deals

were handled; (3) the fact that Howard's name did not appear as a principal in any of these matters; and (4) the other facts and circumstances in the record indicating that his relation to and interest in these various transactions was not disclosed but, in fact, purposely and painstakingly covered up. From this the trial judge could reasonably draw the further inference that he concealed all this information from the board. Director Hudson's testimony that he had no knowledge of such matters, and, in effect, that Howard made no such disclosures to the board when he was present, lends support to this inference of concealment on the part of Howard. These facts and circumstances amply support the finding of estoppel.

The second difficulty lies in the trial judge's evaluation of Howard's testimony to the effect that he fully revealed to the board his interest in and relation to these various deals. The inescapable conclusion is that the judge did not believe him. In his memorandum ruling the judge said that material testimony given by appellant "was directly contrary to that given by him in a criminal trial in the federal court which likewise involved the activities of the defendant [appellant] in connection with the plaintiff corporation. Accordingly, defendant's [appellant's] credibility was seriously impaired."

Appellant also argues that the evidence is insufficient to sustain the amount of the judgment against him. The total of the amounts proved under the counts herein summarized aggregates $18,927.43 which is $169.56 more than the total judgment[7] against him. Thus Howard is not aggrieved.

Count 3 is the only transaction about which there can be any serious question relative to Howard's getting the profit therefrom. He personally approved the purchase of the loan from the Greens. They received $3,100. Plaintiff's loan fees and expenses were $495. Upon someone's instructions, the balance of $598 was paid by check as a "commission" to Emma Morris, a real estate broker. Mrs. Morris, however, knew nothing about the transaction and represented no party to it. The check was endorsed "Emma Morris" but not by her. It was then cashed, on someone's authority, by plaintiff. The court could reasonably draw the inference from Howard's relation to the transaction, the fact that Mrs. Morris was

[7]The judgment against Howard alone is for $17,667.46 and against him and Avalon, jointly and severally, for $1,090.41. Thus the aggregate judgment against Howard is $18,757.87.

not connected with it, the manner in which it was handled, and from all the testimony in the case, that Howard received the proceeds from this check although he denied it.

Appellant vainly argues the findings are contradictory. Findings XVII and XVIII each finds ·the precise amount for which judgment is entered in favor of plaintiff. One finding is on the theory of "secret profits received by" Howard and the other is upon the theory of "money had and received" by Howard "for the use and benefit of plaintiff." The identical amounts are found to be due plaintiff in each finding. There is no contradiction. Appellant's difficulty arises from his failure to recognize that certain counts are in the alternative, viz., Counts 7 and 16, Counts 21 and 22; and Counts 6 and 31. Also, Count 32 while not formally dismissed was abandoned.

Appellant also argues that the court failed to find on material issues. The rule is that "while findings are required upon all material issues a judgment will not be set aside on appeal because of a failure to make an express finding upon an issue if a finding thereon, consistent with the judgment, results by necessary implication from the express findings which are made." (*Richter* v. *Walker*, 36 Cal.2d 634, 640 [226 P.2d 593].) There can be no question but that the court found adverse to Howard on each issue essential to his liability. His complaint is that the court did not in detail make an express finding as to the amount of his secret profits on each transaction, or, in other words, the amount of money he had received for the use and benefit of plaintiff in each of the counts that were not dismissed or abandoned. The finding, however, of the ultimate fact, viz., the amount due plaintiff, "includes the finding of all probative facts necessary to sustain" such ultimate finding. (*Fischer* v. *Ostby*, 127 Cal.App.2d 528, 531 [274 P.2d 221]; *Haigler* v. *Donnelly*, 18 Cal.2d 674, 677-678 [117 P.2d 331]), and "it is unnecessary to state the probative or evidentiary facts. . . ." (*Gschwend* v. *Stoll*, 104 Cal.App.2d 806, 808 [232 P.2d 494].)

Furthermore, finding XVIII, which is based on Count 31 which is a common count for money had and received for the use and benefit of plaintiff, is an adequate finding in which "the court impliedly found in accordance with the evidence presented by the prevailing party" (*Cherry* v. *Hayden*, 100 Cal.App.2d 416, 420-421 [223 P.2d 878]), and amply supports the judgment. This justifies an affirmance insofar as the sufficiency of the findings is concerned.

(*Eistrat* v. *Brush Industrial Lbr. Co.,* 124 Cal.App.2d 42, 45 [268 P.2d 181].)

## WAIVER OF JURY

Appellant also contends that the court erred in denying him the right to trial by jury. An examination of the record discloses, however, that appellant, both before and after the mistrial, filed written waivers of a jury trial. Plaintiff's original complaint was couched in the simple form of a common count for money had and received and sought a maximum recovery of $70,000. After first requesting a trial by jury, the defendants, on September 14, 1951, one day before the trial commenced signed a waiver of jury. During the course of the trial before Judge Mosk, plaintiff asked leave to file an amendment to its complaint. This was granted and such amendment was filed on September 19, 1951. The amended pleading set out in some detail about eight transactions and alleged that because of the clandestine nature of the dealings, defendants ''are estopped from pleading, alleging or urging the lapse of time of any statute of limitations as a defense to this action.'' Defendants thereupon moved for a mistrial upon the grounds of surprise and unpreparedness to defend. Judge Mosk granted the mistrial and ordered plaintiff ''to file a further amendment to the complaint *naming every transaction upon which he* (sic) *relies.*'' (Emphasis added.) A second amendment was filed on Oct. 1, 1951. On that date, with knowledge that a retrial would be held on amended pleadings setting forth the various transactions constituting plaintiff's claim, and after about five days of trial prior to the mistrial, during which the nature of plaintiff's case had been developed, defendants filed a second written waiver of jury trial, dated Sept. 28, 1951. Thereafter, plaintiff filed its third amended complaint on December 13, 1951, further amplifying and defining the transactions comprising its claim to recovery of the $70,000 originally sought. Defendant answered, interposing no affirmative defense. In March, 1952, and in January, 1953, defendants filed demands for a trial by jury. On June 30, 1953, the time set for trial of the action, plaintiff moved that the cause be transferred from the jury to the nonjury calendar. The presiding judge granted this motion, and the trial subsequently proceeded to the court sitting without a jury.

 As the point of departure for our discussion of appellant's contention that he was entitled as of right to a jury upon retrial, we assume, *arguendo,* but without deciding, that

notwithstanding defendants' waiver of trial by jury when this case was first at issue, their right to a trial by jury was restored, after the declaration of mistrial, with respect to subsequent proceedings. But this proposition is of no assistance to them since, following the mistrial, defendants again, in writing, unequivocally waived trial by jury. This was done (1) after five days of trial oriented them as to the nature of the transactions upon which plaintiff relied, (2) after plaintiff had already filed one amendment setting forth some eight specific transactions and introducing allegations charging appellant with concealment to estop defendants from relying on any statute of repose, and (3) with full knowledge that the court, on granting a mistrial, had ordered plaintiff to further amend, so that every transaction on which its action was predicated would be enumerated therein. In this posture of the case, defendants cannot escape the force of their solemn waiver of a jury trial after the mistrial by asserting that plaintiff added new issues to its original complaint by its third amendment. That amendment neither changed the cause of action nor altered the issues, nor effected any material change in the pleadings, nor prayed for any different relief; it merely particularized the transactions making up defendants' scheme of operations, much like a bill of particulars amplifies the obligation tersely stated in a common count. But what is here significant is that defendants, having advance notice that plaintiff's complaint was to be further amended to set forth every transaction, consciously chose to rewaive a jury upon the next trial without regard to the nature of the transactions set out. Defendants' relinquishment of a jury with full knowledge of the facts being a matter of trial tactics, the waiver is as binding upon them as if made after the amendment. (See *Cloud* v. *Market Street Ry. Co.*, 74 Cal.App.2d 92, 104 [168 P.2d 191].) Where a trial by jury has been regularly and voluntarily waived, such waiver cannot later be withdrawn except in the discretion of the court. (*People* v. *Colton*, 92 Cal.App.2d 704, 707 [207 P.2d 890].) Under the circumstances previously related, which suggest no more than that defendants changed their minds after two waivers, the court did not abuse its discretion in having the case tried without a jury. (*Harmon* v. *Hopkins*, 116 Cal.App. 184, 188 [2 P.2d 540].)

## CROSS-COMPLAINT

Appellant also urges that "the trial court erred in sustaining plaintiff's demurrer to the cross-complaint without

leave to amend and granting plaintiffs' motion for dismissal of cross-complaint." A prefatory epitomization of the pleading in question is required in answer to this contention.

The cross-complaint was filed by appellant and Dorothy Howard and comprises six causes of action, all sounding in tort. The first two counts purport to state causes of action for slander of title to certain real property (for convenient reference, designated Lots 14 and 15) under substantially the following circumstances: it is alleged that *Dorothy was and is the owner* of the above-mentioned lots and *through her sister, Colleen Williams,* obtained from plaintiff loan No. 32 on Lot 14 and loan No. 281 on Lot 15, upon the execution of notes secured by trust deeds on the respective lots; that plaintiff wrongfully caused false notices of default and of trustee's sale to be published, thus clouding, slandering and rendering unmarketable the title to said property; that to eliminate the cloud, action No. 477518[8] was instituted for an injunction to restrain the sale of said property and for an accounting of the amounts due under the respective notes; that a final judgment was entered enjoining and restraining plaintiff from selling Lots 14 and 15 under the notices of default and granting other relief; that the sum of $5,000 was expended by cross-complainants for attorney's fees in prosecuting the above action; that the recordation of the notice of default and publication of the notice of trustee's sale "decreased the value of the property owned by Dorothy B. Howard and rendered it untenable, all to the damage of said real estate and to cross-complainants in the sum of $30,000." Exemplary damages to cross-complainants are also alleged.

The third and fourth counts make essentially the same allegations, except that they charge a conspiracy among plaintiff and others to cloud and slander Dorothy's title, causing great damage to the cross-complainants. The fifth and sixth counts reallege Dorothy's ownership of Lots 14 and 15 and charge that plaintiff engaged in the acts previously described solely to embarrass "cross-complainant [presumably Dorothy] in the free enjoyment, use and disposition of said lots" and that cross-complainants' interests have been greatly depreciated and damaged because of such acts by plaintiff, which

---

[8]As appears in Count 5, this case was entitled "Colleen B. Williams and Dorothy B. Howard, Plaintiffs, vs. Broadway Federal Savings & Loan Association of Los Angeles, a corporation, et al." Appellant was not a party to that action, nor is Colleen B. Williams a party to the cross-complaint therein.

caused them vexation and harassment, and "rendered the value of cross-complainants' property unmarketable," all to the damage of cross-complainants.

Plaintiff's separate, general and special demurrers were sustained without leave to amend. From the judgment effectuating these orders, appellant alone has appealed.

Under such circumstances, whatever error, if any, inheres in the court's ruling as against his nonappealing coparty, Dorothy's rights cannot be asserted by Herbert as a ground for reversal. (*Fisher* v. *Nash Bldg. Co.*, 113 Cal.App.2d 397, 404 [248 P.2d 466]; *Landfield* v. *Gardner*, 88 Cal.App.2d 320, 323 [198 P.2d 717].) That being so, no merit attaches to appellant's claim of judicial error on this phase of the case. He, as the sole appealing party, has not been aggrieved by the court's rulings on the cross-complaint.

For it is amply clear from an analysis of that pleading that all the direct and consequential damages allegedly sustained under each count stem from the disparagement of *Dorothy's* title by plaintiff. Counts one and two are bottomed on an alleged slander of Dorothy's title to the lots in question. Counts three and four, charging a conspiracy to slander said title, are substantially similar to the previous counts.

"Where two or more persons are sued for a civil wrong effected by conspiracy, it is the civil wrong resulting in damages, and not the conspiracy, which constitutes the cause of action." (*Biggs* v. *Tourtas*, 92 Cal.App.2d 316 [206 P.2d 871].) Counts five and six, based on the same recordation and publication of the notices of default and trustee's sale, add no new or distinct cause of action to the cross-complaint. They merely emphasize plaintiff's alleged notice as a foundation for exemplary damages by alleging the above publications were part of a course of harassment and vexation designed to interfere with the free use, disposition, enjoyment and vendibility of the two lots. At most, they reflect an alternate theory of the basis of recovery or measure of damages rather than a separable cause of action. (*Wells* v. *Lloyd*, 6 Cal.2d 70, 88 [56 P.2d 517].) The quintessence of the pleading is the injury to Dorothy's title and the damage flowing therefrom.

The gravamen of an action for wrongful disparagement of title to real property is the invasion of the interest in its marketability. (*Phillips* v. *Glazer*, 94 Cal.App.2d 673, 677 [211 P.2d 37].) The conventional elements of damage are the pecuniary loss caused by the impairment of vendibility of the interest in the property and the cost of clearing title from the disparaging claim. (*Phillips* v.

*Glazer, supra*; Rest., Torts, § 663(b).) Assuming for the sake of argument that the cross-complaint states a valid cause of action in favor of Dorothy, the nonappealing party, that pleading not only fails to allege the invasion of any legally protected interest in appellant, but inferentially even negatives such an implication. The cross-complaint discloses that the loans on the lots were obtained by Colleen B. Williams for Dorothy and the allegation is constantly iterated that Dorothy was the owner of the lots. No assertion is made that appellant had any interest therein. It is highly significant that action No. 577518, to enjoin the trustee's sale, was brought by Dorothy and Colleen Williams; appellant's brief refers to that action as one brought by Colleen and Dorothy "as plaintiffs and owners" of the two lots. Appellant was not a party to that action; and any right to recover attorney's fees expended in that action, if recoverable at all, accrued to Dorothy, and not to a stranger to the action who might have advanced such funds. It is thus plain that as to appellant the demurrer was properly sustained. ▮ The burden of showing that the trial court abused its discretion in not permitting an amendment rests upon appellant. (*Vilardo* v. *County of Sacramento,* 54 Cal.App.2d 413, 417 [129 P.2d 165].) That burden is not met where, as here, the record before us is devoid of any indication that the cross-complaint could be so amended as to state a cause of action in appellant. (*Paraco, Inc.* v. *Department of Agr.,* 118 Cal.App.2d 348, 358 [257 P.2d 981].) ▮ Under such circumstances, it will be presumed that appellant pleaded all the facts favorable to his case as strongly as it was possible for him to do. (*Faulkner* v. *California Toll Bridge Authority,* 40 Cal.2d 317, 328 [253 P.2d 659]; *Augustine* v. *Trucco,* 124 Cal.App.2d 229, 244 [268 P.2d 780].) For the foregoing reasons, there is no basis for disturbing the court's judgment on the cross-complaint.

We find nothing in the record indicating a miscarriage of justice. Under such circumstances the judgment may not be reversed. (Cal. Const., art. VI, § 4½.)

The appeal from the order denying motion for new trial is dismissed. The judgment is affirmed.

McComb, Acting P. J., concurred.

A petition for a rehearing was denied June 15, 1955, and appellant's petition for a hearing by the Supreme Court was denied July 27, 1955.